In re **BARRINGTON OAKS GENERAL PARTNERSHIP, a general partnership, Debtor.**

In re **STARCREST PROPERTIES, LTD., a limited partnership, Debtor.**

**Bankruptcy Nos. 80–01233, 80–01234.**

United States Bankruptcy Court, D. Utah.

Dec. 9, 1981.

William G. Fowler, Bryce E. Roe, Anna W. Drake, Roe & Fowler, Salt Lake City, Utah, for debtors.

Herschel J. Saperstein, Weston L. Harris, Watkiss & Campbell, Salt Lake City, Utah, William H. Bingham, McGinnis, Lochridge

& Kilgore, Austin, Tex., for First Nat. Bank of Minneapolis.

## MEMORANDUM OPINION

RALPH R. MABEY, Bankruptcy Judge.

### STATEMENT OF ISSUES AND FACTUAL BACKGROUND

This case raises two issues: whether changing buyers under a trust deed "impairs" the lienor within the meaning of 11 U.S.C. Section 1124, and whether a plan of reorganization may be confirmed if no impaired class accepts in light of 11 U.S.C. Section 1129(a)(10).

On August 12, 1977, Starcrest Properties, Ltd. (Starcrest), a limited partnership, through Coordinated Financial Services (Coordinated), its corporate general partner, executed a "Promissory Note," "Loan Agreement," "Deed of Trust and Security Agreement," and "Assignment of Rents" for the acquisition of an apartment complex in San Antonio, Texas. The lender was First National Bank of Minneapolis (bank). The loan was "exculpatory" or "non-recourse," *i.e.*, in the event of default, the bank may foreclose on the property but may not collect any deficiency from Starcrest or Coordinated. The trust deed contained a "due on sale" clause which forbade transfer of the property without the consent of the bank.[1]

In December, 1978, Starcrest made an "Earnest Money Contract" to sell the property to Richard Breithaupt, Jr., who was purchasing for BMP, a general partnership.[2] The contract (Addendum ¶ B.5) recognized the due-on prerogative of the bank. In April, 1979, Starcrest transferred the property by "Special Warranty Deed" to

---

1. Due on clauses "are specialized types of acceleration clauses that permit the lender to declare the entire balance of the indebtedness due and payable upon ... the sale ... of the secured property." Note, "Judicial Treatment of the Due-On-Sale Clause: The Case for Adopting Standards of Reasonableness and Unconscionability," 27 Stan.L.Rev. 1109, 1110 (1975). They protect lenders from financially irresponsible transferees and waste to the collateral. "The real significance of these clauses, however, lies in their use as leverage for increasing the interest rate on an existing mortgage. This leverage is obtained by agreeing to waive the right to accelerate if the purchaser will agree to pay the increased interest rate. Savings institutions are thus able to bring their long-term investment portfolios up to current rates without incurring the delays and costs of calling the loan and proceeding with a foreclosure action before relending the funds at the present market rate." *Id.* at 1110–1111.

The scope of the due on clause in this case, however, is unclear. The bank purchased the loan from a real estate investment trust. The documents of purchase include a trust deed between the REIT and Calhoun-Carnes, Inc., a Texas corporation. The trust deed contains a due on clause (Section 2.2(1)) which forbids transfer of the property without consent of the obligee "except sales, trades, transfers, assignments, exchanges, or other dispositions in connection with which the grantee or transferee expressly assumes and unconditionally agrees to pay and perform the obligation." Starcrest replaced Calhoun-Carnes as obligor and the loan as renegotiated was memorialized in the August, 1977 note, loan agreement, trust deed, and assignment of rents. The August, 1977 trust deed (¶ 6.7) makes transfer of the property without consent of the bank an event of default allowing acceleration of the note. An exception similar to that found in the Calhoun-Carnes trust deed is absent. The note and loan agreement do not contain due on language, but the latter (¶ II.5. J.) requires Starcrest to "deliver an acknowledgement by Starcrest that all security agreements pertaining to the Property and granted to [the REIT] have been transferred to *and are continued in full force and effect for the benefit of [the Bank].*" (Emphasis supplied.) This appears to perpetuate the Calhoun-Carnes trust deed, including its due on term and exception, which therefore may be incorporated in the August, 1977 trust deed.

2. The date of this contract is uncertain. The contract is dated December 19, 1978. The seller's signature alludes to an " 'Earnest Money Contract Seller's Addendum' dated January 9, 1979." The addendum attached to the contract, however, is neither styled "seller's addendum" nor dated. The title company's signature notes receipt of the earnest money (checks dated February 22 and 23) and the contract on February 26. The disclosure statement says that the contract was executed by BMP and debtors on December 20, 1978, although Oaks is not listed as a party on the copy of the contract filed with the court. Other pleadings, *e.g.*, an "Application for Authorization to Use Cash Collateral and to Incur Debt Secured by Property of the Estate" (¶ IV), say that the contract is dated December 28 and that it contains "subsequent addendums," although only one addendum has been filed with the court.

Barrington Oaks (Oaks), another general partnership.[3] This transfer was subject to the lien of the bank. The bank learned of both transactions in the spring of 1979.

In November, 1979, litigation ensued between Starcrest, Oaks, and BMP, which in May, 1980, was compromised by a "Settlement Agreement." The settlement provides for sale of the property from Oaks to BMP. It also provides for lease of the property to BMP. BMP is in possession of the property as lessee and buyer.[4] The agreement (¶ 7.D.), as does the earnest money contract, acknowledges the due on impediment to sale.

On June 3, 1980, because of nonpayment and other defaults, the bank gave notice of foreclosure. Sale was scheduled for July 1. On June 30, Starcrest and Oaks filed peti-

tions under Chapter 11. On July 7, their cases were consolidated for purposes of administration. On October 28 and December 30, they filed a plan and disclosure statement.

The plan implements the settlement with BMP. Claims are divided into three classes. The first consists of priority claims, the second of unsecured creditors, and the third of secured creditors, *i.e.*, the bank and another lienor on the property, John Hancock Mutual Life Insurance Company (Hancock).[5] Classes one and two are to be paid in full on the effective date of the plan[6] and are thus described as unimpaired.[7] The obligations owing to the bank and Hancock will be assumed by BMP. Defaults (except any violation of the due on clause) are to be cured on the effective date of the plan.

---

3. A memorandum filed by the bank gives this date as April 13, 1979, although the copy of the deed accompanying the memorandum is undated.

4. The fact of possession is conceded by the bank in several pleadings. There is, for example, a "Memorandum in Support of Application of First National Bank of Minneapolis to Require Debtors as Lessors to Enforce Lease or in the Alternative to Terminate Lease and Recover Unpaid Lease Payments and Other Damages" which states that "BMP is in possession of the apartment complex pursuant to the lease agreement and is clearly reaping the benefits of operating the apartment complex." The parties have not explored the implications, if any, of this circumstance under 11 U.S.C. Sections 365(h), 365(i), and 365(j). *Cf. In re Summit Land Company*, 13 B.R. 310 (D.Utah 1981).

5. The plan does not create a class for interests. The limited partners own equity securities as defined in 11 U.S.C. Section 101(15)(B) which the legislative history equates with "interests" classifiable under 11 U.S.C. Section 1122(a). *See, e.g.*, H.Rep.No.95–595, 95th Cong., 1st Sess. 406 (1977), U.S.Code Cong. & Admin. News 1978, p. 5787. The general partners, as "owners" of the business, although not mentioned in the language, appear to be covered in the spirit of the Code. *See, e.g.*, 124 Cong.Rec. H11,105 (daily ed. September 28, 1978); 5 Collier on Bankruptcy ¶ 1124.03 at 1124–9 n. 2 (15th ed. 1980); Klee, "All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code," 53 Am.Bank.L.J. 133, 145 n. 98 (1979). Failure to specify the class to which these interests belong and whether it is impaired or unimpaired runs afoul of 11 U.S.C.

Section 1123(a)(2) and Section 1123(a)(3) and constitutes a basis for denying confirmation under 11 U.S.C. Section 1129(a)(1). *See, e.g.*, H.Rep.No.95–595, 95th Cong., 1st Sess. 412 (1977).

6. The Code does not define the term "effective date of the plan." It may mean "the first day after which the order of confirmation becomes final." Klee, "All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code," 53 Am.Bank.L.J. 133, 137 n. 24 (1979). Klee may be referring to the "final order" provisions of the Bankruptcy Rules. *See* Rule 803, Fed.R.Bankr.P.; Rule 8006, Interim R.Bankr.P. Another commentator has noted that "[t]he plan can probably establish the effective date, as longs as it is within reason. For example, the plan might provide that the effective date will be when the order of confirmation becomes final or, if there is a condition to the effectiveness of the plan, when the condition is satisfied." 3 Nortons Bankruptcy Law and Practice, Section 62.06 at 12 (1980). The plan in this case defines the "effective date" as "that date on which the order confirming the plan becomes final and unappealable."

7. Article II of the plan, apparently relying upon 11 U.S.C. Section 1124(3)(A), specifies that the first two classes of claims are unimpaired. The disclosure statement, however, states that in order for the plan to be accepted, "of the ballots cast, creditors that hold at least two-thirds in amount plus more than one-half in number of the allowed claims of both Class II and Class III must vote for the Plan." *Compare* 11 U.S.C. Section 1126(f).

Thus class three is also described as unimpaired.[8]

On January 20, 1981, a confirmation hearing was held. The bank lodged several objections: (1) that classification of the bank and Hancock together was improper under 11 U.S.C. Section 1122; (2) that description of the bank as unimpaired was improper under Section 1124; (3) and that without acceptance by at least one impaired class, the plan could not be confirmed because of Section 1129(a)(10). The court ruled that the bank and Hancock must be separately classified and took the remaining objections under advisement.[9] It now rules that the bank is impaired under Section 1124 and that the plan cannot be confirmed because of Section 1129(a)(10).[9a]

## IMPAIRMENT UNDER SECTION 1124

### Positions of the Parties

Section 1124 defines impairment. It provides:

Except as provided in Section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan

(1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest;

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—

(A) cures such default, other than a default of a kind specified in section 365(b)(2) of this title, that occurred before or after the commencement of the case under this title;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or

(3) provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to—

(A) with respect to a claim, the allowed amount of such claim; or

(B) with respect to an interest, if applicable, the greater of—

(i) any fixed liquidation preference to which the terms of any security representing such interest entitle the holder of such interest; and

(ii) any fixed price at which the debtor, under the terms of such security, may redeem such security from such holder.

The bank argues that Starcrest breached the due on clause when it sold the property to Oaks and that debtors breached this provision when they sold the property to BMP. The latter sale is being implemented, and thus the breach will be perpetuated, through the plan. The contractual rights of the bank are "altered" under Section 1124(1), and the breach, unlike a default for nonpayment, is incurable under Section 1124(2). Even if it were curable, since the rights of the bank are altered, debtors cannot satisfy the requirement of Section 1124(2)(D).

---

**8.** *But see supra* note 7, at 954.

**9.** Other objections concerning best interest, feasibility, and fair and equitable standards under 11 U.S.C. Sections 1129(a)(7), 1129(a)(11) and 1129(b) require an evidentiary hearing which was deferred until ruling on these threshold matters.

**9a.** The court ruled in open court on the matters under advisement on August 18, outlining its reasons on the record. This Memorandum Opinion augments that ruling.

Debtors counter that their failure to cure the breach does not impair the bank because due on provisions, as unreasonable restraints on alienation, are unenforceable. *See, e.g., Wellenkamp v. Bank of America,* 21 Cal.3d 943, 148 Cal.Rptr. 379, 582 P.2d 970 (1978). The bank has no right in this regard which may be altered or the breach of which requires a cure.

■ Hence, the validity of the due on provision, as a matter of state law, has been the point of departure for the parties in their analysis of impairment under Section 1124. Resolution of the due on problem, however, is unnecessary.[10] The bank is impaired because the sale to BMP, even without a due on restriction, changes obligors and therefore alters rights under the instruments memorializing the loan. This conclusion flows from an examination of the role and language of Section 1124, and its relation to 11 U.S.C. Section 1129(b).

### The Role of Impairment

Impairment stands at the intersection of two conflicting ideals of reorganization. The first is represented in Chapter X of the Act, with its provision for an independent trustee and the "fair and equitable" rule.

The second is reflected in Chapter XI of the Act, with its emphasis on speed, economy, informal negotiations, and consensual arrangements.[11]

The premise of Chapter X, born of the Douglas report on protective committees,[12] was that creditors, for the most part, were unsophisticated and disorganized; their rights were subverted by "insiders" who manipulated the reorganization machinery. "The timid souls, the guileless and confiding masses," as one observer put it, "have been forgotten men." Foster "Conflicting Ideals for Reorganization," 44 Yale L.J. 923, 924 (1935).[13] An independent trustee displaced these insiders and exposed corporate wrongdoing; he proposed a plan which satisfied the "fair and equitable" rule.

■ The rule, briefly put, is that no class may participate under a plan unless classes having priority are compensated in full.[14] The reasons for the rule are manifold. It vindicates the contractual priorities for which parties bargained and on which their expectations in the event of liquidation rest: seniors who bargained for a moderate return and safety of principal expect to be paid first; juniors who supplied risk capital must accept the consequence of their speculation. These priorities, once fixed, are

10. Assuming, however, that the validity of the due on clause were at issue, other problems, not addressed by the parties, are present. For example, has the due on clause been breached? The recitation of facts, *supra* note 1, at 953, suggests that, read together, the August, 1977 trust deed and Calhoun-Carnes trust deed may contain an exception to the requirement of bank consent which may apply to the sale to BMP.

11. "Fundamentally, our standard of fairness in bankruptcy reorganization is the antithesis of composition." Blum, "Full Priority and Full Compensation in Corporate Reorganizations: A Reappraisal," 25 U.Chi.L.Rev. 417 (1958).

12. SEC, Report on the Study and Investigation of the Work, Activities, Personnel and Functions of Protective and Reorganization Committees (1936–1939).

13. "Although the need to scale down claims in the reorganization proceeding was justified, creditors, because of the management's dominant influence, could not be left to make their own decisions without judicial control. '[E]xperience has shown that unless it is re-

strained by some effective control exercised by judicial or other public agencies, the corporate management will in many cases seek to use reorganization ... for less justifiable reasons' than readjusting debt; it may use its power to protect its own investment and to perpetuate itself. Moreover, some felt, probably correctly, that the majority of a class was largely incapable of protecting the class against unfair reorganization plans." Trost, "Corporate Bankruptcy Reorganizations: For the Benefit of Creditors or Stockholders?" 21 U.C.L.A.L.Rev. 540, 543–544 (1973).

14. The rule is that "before a class of investors can participate in a reorganization, all more senior classes must be compensated in full for their claims, measured on the basis of their priorities upon involuntary liquidation, unless the junior class contributes to the reorganized enterprise something that is reasonably compensatory and measurable." Blum & Kaplan, "The Absolute Priority Doctrine in Corporate Reorganizations," 41 U.Chi.L.Rev. 651, 652 (1974).

honored as a matter of equity not bargaining strength. The rule thus assists the trustee in neutralizing insiders who may conspire to dilute the claims of others. The rule also encourages the simplification of capital structures, so that businesses are not artificially reorganized. This in turn prevents the foisting of worthless securities on unsuspecting investors.[15] Indeed, the rule is the foundation upon which a plan in Chapter X is constructed; a judicial finding that it has been satisfied precedes and preconditions any vote on a plan.[16]

But critics of the rule questioned whether this degree of judicial control struck a proper balance between creditor democracy and the fairness of a plan. They asked whether the rule was self defeating, especially where retention of management equity holders might be essential to preserve the going concern value of a business. In these situations, there might be "merit to the proposition that the creditors themselves should be permitted to bargain out the allocation of the going concern bonus with the debtor." Trost, "Corporate Bankruptcy Reorganizations: For the Benefit of Creditors or Stockholders?" 21 U.C.L.A.L.Rev. 540, 550 (1973).

Opponents of the rule likewise complained that it was difficult to apply. The valuation process, they said, is cumbersome and unreliable; its effect, according to one author, has been to "relegate appraisal . . . to the good graces of the fortune teller. Everything is a question of 'judgment,' that is, of guesswork." J. Bonbright, The Valuation of Property 252–253 (1937). This might work to slow or stalemate reorganization. While the SEC and others point to the need for *rebirth* of a business, the reform-minded argue that the patient may die *in utero*. The pendulum, under the weight of their influence, swung back to

**15.** Two commentators, for example, have argued that "[t]he control of capital structures through reorganization should go further. It is generally regarded as dangerous to have much of the capitalization of a business represented by securities on which a fixed maximum return is payable. Such a financial structure promises a new default with every considerable fluctuation of income, and tempts the directors to speculative managerial policies. If the capitalization of a company carries large fixed or maximum charges, its management, usually holding equities, stands to gain disproportionately from a course of action, however risky, which increases the existing overall rate of return on capital. *And so far no device short of charter restriction has developed for protecting the corporation against its management in this particular of financial policy."* Rostow & Cutler, "Competing Systems of Corporate Reorganization: Chapters X and XI of the Bankruptcy Act," 48 Yale L.J. 1334, 1375 (1939). Put differently by another observer: "[T]he [Securities and Exchange] Commission has consistently emphasized the importance of a sound capital structure. Among the most important aspects of sound structure, in the Commission's *opinion, is a reasonably small percentage of* debt and a substantial value behind the common stock equity. Much of the financial disaster of the past, in its opinion, has been due to top-heavy debts in corporate financial structures. Conversely, much wild speculation and market manipulation is encouraged by the existence of 'poker chip' equity securities with little or no value behind them. Thus, in reorganization plans we condemn too heavy a load of

senior securities. This attitude is not inconsistent with our support of the role of full compensation for senior securities enunciated in the *Case v. Los Angeles Lumber*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 case. On the contrary, both positions discourage trading on thin equity; and by doing so they protect bondholders through the insistence on a protective cushion and the discouragement of skimping on maintenance to stave off default and perpetuate control." Frank, "Epithetical Jurisprudence and the Work of the Securities and Exchange Commission in the Administration of Chapter X of the Bankruptcy Act," 18 N.Y.U.L.Q.Rev. 317, 344–345 (1941).

**16.** This view was enforced in proceedings under Section 77B, the predecessor to Chapter X: ". . . where a plan is not fair and equitable as a matter of law it cannot be approved by the court even though the percentage of the various classes of security holders required by Section 77B(f) for confirmation of the plan has consented . . . the court is not merely a ministerial register of the vote of the several classes of security holders. All those interested in the estate are entitled to the court's protection. Accordingly, the fact that the vast majority of the security holders have approved the plan is not the test of whether the plan is a fair and equitable one . . . Every important determination by the court in receivership proceedings calls for an informed independent judgment." *National Surety Company v. Coriell*, 289 U.S. 426, 436, 53 S.Ct. 678, 681, 77 L.Ed. 1300 (1933).

the ideal of private control with a minimum of judicial intrusion.[17]

Section 1124, in the light of this history, is pivotal. Chapter 11 softens the regime of Chapter X and favors consensual compositions at the expense of the fair and equitable standard. Thus, 11 U.S.C. Section 1123(b)(1) allows the impairment or nonimpairment of any class of claims under a plan. 11 U.S.C. Section 1123(a)(2) requires specification of any class of claims which is impaired under a plan. 11 U.S.C. Section 1123(a)(3) requires specification of the treatment of any class of claims which is impaired under a plan. 11 U.S.C. Section 1126(f) states that a class of claims which is unimpaired is deemed to have accepted a plan. 11 U.S.C. Section 1129(a)(8) provides, as a condition to confirmation, that all classes of claims must either accept or be unimpaired under a plan. Section 1129(b) permits confirmation notwithstanding Section 1129(a)(8).

Section 1129(b) contains the so-called "cram down" powers which may be unleashed only if the plan is fair and equitable. This determination, as noted above, may require an expensive and time-consuming valuation of the business to assure that values are not improperly diverted to junior interests. Congress expressed hope, via Section 1129(a)(8), that parties, by agreement, could avoid the onus of Section

17. The literature analyzing the rule and advocating its modification is immense. For a sampling, see, e.g., Billyou, "Priority Rights of Security Holders in Bankruptcy Reorganization: New Directions," 67 Harv.L.Rev. 663 (1954); Billyou, " 'New Directions': A Further Comment," 67 Harv.L.Rev. 1379 (1954); Blum, "The 'Fair and Equitable' Standard for Confirming Reorganization Under the New Bankruptcy Code," 54 Am.Bank.L.J. 165 (1980); Blum, "Reorganization Doctrine As Recently Applied by the Securities and Exchange Commission," 40 U.Chi.L.Rev. 96 (1972); Blum, "Some Marginal Notes on TMT Trailer Ferry Reorganization: The New Math," 1968 The Sup.Ct.Rev. 77; Blum, "Full Priority and Full Compensation in Corporate Reorganizations: A Reappraisal," 25 U.Chi.L.Rev. 417 (1958); Blum, "The 'New Directions' For Priority Rights in Bankruptcy Reorganizations," 67 Harv.L.Rev. 1367 (1954); Blum, "The Law and Language of Corporate Reorganization," 17 U.Chi.L.Rev. 565 (1950); Blum & Kaplan, "The Absolute Priority Doctrine in Corporate Reorganizations," 41 U.Chi. L.Rev. 651 (1974); Bonbright & Bergerman, "Two Rival Theories of Priority Rights of Security Holders in a Corporate Reorganization," 28 Col.L.Rev. 127 (1928); Brudney, "The Bankruptcy Commission's Proposed 'Modifications' of the Absolute Priority Rule," 48 Am.Bank.L.J. 305 (1974); Brudney, "The Investment-Value Doctrine and Corporate Readjustments," 72 Harv.L.Rev. 645 (1959); Dodd, "Fair and Equitable Recapitalizations," 55 Harv.L.Rev. 780 (1942); Dodd, "The Securities and Exchange Commission's Reform Program For Bankruptcy Reorganizations," 38 Col.L.Rev. 223 (1938); Douglas, "Protective Committees in Railroad Reorganizations," 47 Harv.L.Rev. 565 (1934); Foster, "Conflicting Ideals For Reorganization," supra; Frank, "Epithetical Jurisprudence and the Work of the Securities and Exchange Commission in the Administration of Chapter X of the Bankruptcy Act," 18 N.Y.U. L.Q. 317 (1941); Frank, "Some Realistic Reflections on Some Aspects of Corporate Reorganization," 19 Va.L.Rev. 541 and 698 (1933); Frye, "The 'Fair and Equitable' Doctrine: Are Liquidation Rights a Realistic Standard During Corporate Reorganization?" 20 U.Cath.L.Rev. 394 (1971); Gardner, "The SEC and Valuation Under Chapter X," 91 U.Pa.L.Rev. 440 (1943); Guthmann, "Absolute Priority in Reorganization: Some Defects in a Supreme Court Doctrine," 45 Col.L.Rev. 739 (1945); Katz, "The Protection of Minority Bondholders in Foreclosures and Receiverships," 3 U.Chi.L.Rev. 517 (1936); Klee, "All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code," 53 Am.Bank.L.J. 133 (1979); Rostow & Cutler, "Competing Systems of Corporate Reorganizations: Chapters X and XI of the Bankruptcy Act," 48 Yale L.J. 1334 (1939); Swaine, " 'Democratization' of Corporate Reorganizations," 38 Col.L.Rev. 256 (1938); Trost, "Corporate Bankruptcy Reorganizations: For the Benefit of Creditors or Stockholders?" supra; Weiner, "The Securities and Exchange Commission and Corporate Reorganization," 38 Col.L.Rev. 280 (1938); Weiner, "Conflicting Functions of the Upset Price in a Corporate Reorganization," 27 Col.L.Rev. 132 (1927); Note, "From Debtor's Shield to Creditor's Sword: Cram Down Under the Chandler Act and the Bankruptcy Reform Act," 55 Chicago-Kent L.Rev. 713 (1979); Note, "The Proposed Bankruptcy Act: Changes in the Absolute Priority Rule For Corporate Reorganizations," 87 Harv.L.Rev. 1786 (1974); Note, "The Full Compensation Doctrine in Corporate Reorganizations: A Schizophrenic Standard," 63 Yale L.J. 812 (1954); Note "Allocation of Securities in Corporate Reorganizations: Claims Measurement Through Investment Value Analysis," 61 Yale L.J. 656 (1952); Note, "Protective Committees and Reorganization Reform," 47 Yale L.J. 229 (1937).

1129(b). Impairment is instrumental in realizing this hope. Here, for example, by describing the bank as unimpaired, debtors have invoked the "deemed acceptance" provision of Section 1126(f). This at once prevents the bank from dissenting [18] and satisfies the requirement of Section 1129(a)(8), thereby obviating resort to Section 1129(b).

But Section 1124, by defining who may dissent from a plan, not only serves negotiated plans but also is the threshold to creditor protection. It assimilates both ideals of reorganization and the purposes to be served under Section 1129(a)(8) and Section 1129(b). These ideals and purposes are discernible in the language of Section 1124 and in its relation to Section 1129(b). [19]

### The Language of Section 1124

Impairment originated with, if it was not derived from, Section 107 of the Act, former 11 U.S.C. Section 507, which provided that "creditors" or "any class thereof" was "affected" for purposes of a plan "only if their or its interest shall be materially and adversely affected thereby."

Collier examines Section 107 on two fronts: by analyzing the terms "interest" and "affected." The term "interest," in his view, has a:

somewhat different significance than that of "rights." "Interest" means more than the bare legal right embodied in a claim or a share of stock; it connotes the pecuniary stake the claimant or shareholder has, plus the legal rights or privileges pertaining to it. In the sense in which the word "interest" is used in Chapter X, the factor of pecuniary stake is uppermost. A claimant or shareholder whose claim or stock is valueless because the property of the debtor is insufficient to care for senior lienors or senior classes of creditors and stock, or if sufficient for those purposes nothing is left over has no "interest" in the property to be affected by reorganization. He has nothing at stake, and consequently he has nothing that can be materially or adversely affected.

Whether or not a plan of reorganization contains provisions modifying or altering the "right" of a creditor or stockholder is immaterial in determining whether he has an "interest" affected by the plan . . . [I]t is obvious that a plan expressly modifying or altering the rights of certain classes of claimants may in a given case, nevertheless, materially and adversely affect the "interest" of classes not provided for. Thus, where a debtor corporation is solvent, a plan that does not purport to modify or alter the stockholders' legal status but does permit the waiving of a right of redemption under a trust deed of the debtor, has been held to affect the interests of stockholders in the corporation, since it eliminates a valuable property right that reflected in the value of their stock. 6 Collier on Bankruptcy ¶ 2.20 at 341–342 (14th ed. 1978).

"Affected" is the counterpoint to "interest." An action which is "hurtful, injurious or opposed to the matter of such interest, affects that interest." To illustrate, where a "secured creditor is not dealt with by the plan, but his lien is either left undisturbed on the debtor's property, or remains unim-

---

**18.** Collier notes that a "class which is not impaired under Section 1124 is *deemed* to have accepted the plan pursuant to Section 1126(f) and a formal vote is not required. Even if an [un]impaired class votes to reject the plan, the effect of Section 1126(f) is to conclusively presume acceptance of the plan." 5 Collier on Bankruptcy ¶ 1124.03 at 1124–10 (15th ed. 1980) (emphasis in original). *See also* 3 Nortons Bankruptcy Law and Practice, Section 62.-05 at 8 (1980) ("The Code does not preclude a vote by holders of unimpaired claims and interests, it merely makes it unnecessary"); *But see In re Marston Enterprises, Inc., Spring Run Apartments*, 13 B.R. 514, 7 B.C.D. 1403, 1407 (Bkrtcy.E.D.N.Y.1981). *See also* discussion *infra,* note 35, at 967 and note 38, at 968.

**19.** Impairment, for the most part, is not a device to permit or justify the alteration of rights. It is a measuring rod to determine who may vote, dissent, and invoke the protection of Section 1129(b). Other provisions of the Code, such as Section 1129(b), set the parameters for affecting claims. Section 1124(2) and Section 1124(3) may be exceptions to this rule. For undersecured creditors, however, the threat of Section 1124(3) is vitiated by 11 U.S.C. Section 1111(b).

paired on the property transferred to the new corporation, and the security is equal to or exceeds the amount of the claim, the creditor's interest is not materially and adversely affected." *Id.* ¶ 2.21 at 343. *Accord*, T. Finletter, The Law of Bankruptcy Reorganization 413 (1939).

The idea of "interests" which are "affected" was included in the Commission proposal, *see* Report of the Commission on the Bankruptcy Laws of the United States, H.Doc.No.93–137, pt. II, Section 7–309(a) (1973), as well as legislation introduced in Congress, *see* Section 7–309(a), H.R. 31, 94th Cong., 1st Sess. (1975) and Section 7–307(a), H.R. 32, 94th Cong., 1st Sess. (1975). Its meaning was elaborated by a "Joint Memorandum to Congress" submitted by the National Bankruptcy Conference and the National Conference of Bankruptcy Judges:

If a class is "materially and adversely affected" by a proposed plan, the affirmative vote of that class is necessary for confirmation. But if a class is deemed *not* "materially and adversely affected" by a plan, an affirmative vote of that class is *not* necessary. A class may be deemed not "materially and adversely affected" by a plan (and therefore their votes are not necessary) in either of two circumstances:

A. Classes who retain their interests or rights totally unaffected by a plan are not "materially and adversely affected." Whether a class is "materially and adversely affected" is a question of fact in each case. For example, a plan for the adjustment of private unsecured debt which does not deal at all with subordinated debentures but leaves that class with all rights they had prior to the filing of the proceedings ordinarily would not affect the subordinated debentures class. Therefore, that class is not "materially and adversely affected" by the plan and consents to confirmation from that class are not necessary.

B. A second circumstance in which a class may be deemed "not materially and adversely affected" by a plan is when they have no interest in the reorganiza-

tion business. Even though this class would not be provided for in the plan, its consent would not be necessary because it would not be "materially and adversely affected"; the reorganization values would not reach that class. This would require litigation to determine that the reorganization values do not extend to the eliminated class. If the litigation results in a decision favorable to the proponent of the plan, confirmation can occur without the consents of the class not provided for because its interests are deemed not "materially and adversely affected." *Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary,* 94th Cong., 2d Sess., Ser. 27, pt. 3, at 1941 (1976) (emphasis in original).

After further study, new legislation was introduced, but the concept of "affected" was supplanted by the concept of "impairment." *See* Section 1124, H.R. 8200, 95th Cong., 1st Sess. (1977) and Section 1124, S. 2266, 95th Cong., 1st Sess. (1977). This change prompted a variety of comment. Two authors remarked that Section 1124 is, "at first blush, confusing," but "Congress is struggling with what the 'cram down' rule of Chapter X means, and therefore the curious drafting style." Trost and King, "Congress and Bankruptcy Reform Circa 1977," 33 Bus.Law. 489, 551 (1978). They further observed that Section 1124 "incorporates" the principles from the "Joint Memorandum" and that, taken together, Section 1124 and Section 1129(b) mean "[i]f a claim or interest is not dealt with by the plan, *i.e.,* left undisturbed, the claim is not impaired." *Id.*

The House Report describes Section 1124 as "new" and suggests that it is "designed to indicate when contractual rights of creditors or interest holders are not materially affected." H.Rep.No.95–595, 95th Cong., 1st Sess. 408 (1977), U.S.Code Cong. & Admin.News 1978, p. 6364. The Senate Report disagrees: "the basic concept underlying this section is not new. It rests essentially on Section 107 of Chapter X (11 U.S.C. Section 507) which states that creditors or

stockholders or any class thereof 'shall be deemed to be "affected" by a plan only if their or its interest shall be materially and adversely affected thereby.'" Sen.Rep.No. 989, 95th Cong., 2d Sess. 120 (1978), U.S. Code Cong. & Admin.News 1978, p. 5906. Floor leaders for the final version of the bill said that it "defines the new concept of 'impairment' of claims or interests; the concept differs significantly from the concept of 'materially and adversely affected' under the Bankruptcy Act." 124 Cong.Rec. H11,-103 (daily ed. September 28, 1978); 124 Cong.Rec. S17,419–17,420 (daily ed. October 6, 1978).

There is a temptation, on the facts of this case, to advert to the material and adverse effect standard in construing Section 1124. And, indeed, there are grounds for doing so. For while the language of the statute, in subparts (1) and (2)(D), speaks of "altering" rights, the concept is "impairment," and is thus denominated in other provisions of the Code, suggesting not merely an alteration but also a diminution in the value of a claim.

Nevertheless, the change from "material" and "adverse" effect, to "leaving unaltered," and its distinctive connotation is difficult to ignore. Courts drew a line under the Act between "altering" and "affecting" rights. Section 461(1), former 11 U.S.C. Section 861(1), required a plan under Chapter XII to include "provisions modifying or altering the rights of creditors who hold debts secured by real property . . . . either through the issuance of new securities or otherwise."[20] Section 407, former 11 U.S.C. Section 807, contained material and

adverse effect language identical with Section 107. The Fifth Circuit Court of Appeals, in *Continental Insurance Co. v. Louisiana Oil Refining Corp.*, 89 F.2d 333, 336 (5th Cir. 1937) held that "[t]he substitution of a new debtor, although solvent, is a fundamental alteration of a creditor's rights." At least two courts followed *Continental Insurance* in finding that the substitution of obligors under real estate contracts is an "alteration" of rights under Section 461(1), but have refused to extend its reasoning to the material and adverse effect standard of Section 407. *See In re Pieper*, 4 B.R. 572, 576–577 (Bkrtcy.D.S.D. 1980); *In the Matter of Flushing Mall Company*, 7 B.R. 277, 5 B.C.D. 524 (D.C.S.D.N.Y. 1979). These authorities may explain the dictum in Collier that "under Chapter X a secured creditor was not materially and adversely affected if the property securing his claim was transferred to a new corporation which assumed the claim, and the value of the collateral was equal to or exceeded the amount of the claim. Such a creditor would be impaired under the Code." 5 Collier on Bankruptcy ¶ 1124.02 at 1124–9 (15th ed. 1980).

It may be argued that this reading of Section 1124 is too narrow, and that "impairment," if liberally construed, would reduce "the administrative burden of solicitation of consents, and in many cases [avoid] the time and expense associated with valuation hearings in connection with cram down." *Id.* ¶ 1124.03 at 1124–11.

But this reading of Section 1124 is only narrow in appearance; it is liberal in effect.[21] The material and adverse effect

---

**20.** The reason for this requirement is obscure, but Congress may have believed that its power under the Constitution to pass bankruptcy laws did not extend to reorganizations absent the alteration of creditor rights. *See, e.g., Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary*, 94th Cong., 1st & 2d Sess., Ser. No. 27, Supp.App., pt. 1, at 950 (1976).

**21.** Two writers argue that use of the term "impair," rather than "affect," was designed to improve the opportunities for dissent under a plan. *See* Anderson and Ziegler, "Real Proper-

ty Arrangements Under the Old and New Bankruptcy Acts," 25 Loy.L.Rev. 713, 725 (1979) ("In focusing on the concept of 'impairment' under the new Code, one finds that it is probably more restrictive than the concept of 'affected' under the old Act, that is, a claim is more apt to be 'impaired' than 'affected'"). In support of this view they cite *In re Hall Associates*, 2 B.C.D. 432 (E.D.Pa.1970) and *In re Consolidated Motor Inns*, 1 B.C.D. 1191 (N.D.Ga.1975). These cases construed Section 517 of the Act, former 11 U.S.C. Section 917, which provided: "Nothing in this Chapter [XII] shall be deemed to affect or apply to creditors of any debtor under a mortgage issued pursuant to the Na-

standard was keyed to the value of a claim. Thus if a debtor was insolvent, shareholders were not materially and adversely affected and were denied participation in a plan. *See, e.g., Scolnick v. Connecticut Telephone & Electric Corporation*, 265 F.2d 133, 135 (2d Cir. 1959). But valuation of their interest, even though their rights were unchanged, was a predicate to nonparticipation. *See, e.g.*, Blum, "The Law and Language of Corporate Reorganization," 17 U.Chi.L.Rev. 565, 589 (1950).[22]

Value, however, is irrelevant under Section 1124: "any alteration of rights constitutes impairment even if the value of the rights is enhanced." 5 Collier on Bankruptcy ¶ 1123.04(1) at 1124–12 (15th ed. 1980). *Accord, id.* ¶ 1124.03(1) at 1124–14; Klee, "All You Ever Wanted To Know About Cram Down Under The New Bankruptcy Code," 53 Am.Bank.L.J. 133, 140 n. 55 (1979).[23] Indeed, the purpose of Section 1124 to avoid cram down would be defeated by requiring valuation of claims to deter-

tional Housing Act and Acts amendatory thereof and supplementary thereto; nor shall its provisions be deemed to allow extension or impairment of any secured obligation held by Homeowners' Loan Corporation or by any Federal Home Loan Bank or member thereof." The *Consolidated Motor Inns* opinion perceived "a distinct difference between 'affect' or 'apply' and 'extension' or 'impairment.' The former words contained in the first part of Section 517. . . . essentially refer to a frame of reference or to relevancy. They are extremely broad and would include any action that relates to the obligations referred to in the first part of Section 517. On the other hand, the words 'extension' or 'impairment' are more restrictive and imply some adverse effect upon the subject." *Id.* at 1192–1193. Observing that "the word clearly contemplates some adverse action in regard to the subject matter," the court found no impairment when the creditor had not shown "either that the security for the obligations to it is depreciating or being diminished in value or that it is inadequately secured." *Id.* at 1194. This view, however, equates impairment with the material and adverse effect standard and hence would allow no departure, either more liberal or restrictive, from prior law. As noted below, construing impairment in terms of altering rather than materially and adversely affecting rights does not necessarily broaden the opportunity but merely changes the conditions for dissent under a plan.

**22.** In *In re National Lock Co.*, 9 F.Supp. 432 (N.D.Ill.1934) the court held that an alteration of voting rights and the waiver of an equity of redemption under a mortgage materially and adversely affected shareholders. The waiver of the equity of redemption would be "reflected in the value of their stock" and therefore affected the shareholders. *Id.* at 437. The alteration of voting rights also went to the value of their stock since the change put "the fiscal policies of the debtor beyond their control." *Id.* at 435. *See also Central States Life Ins. Co. v. Koplar Co.*, 95 F.2d 181, 184 (8th Cir. 1936) (oversecured creditor not materially and adversely affected under plan where he loses right to proceed against debtor for deficiency: "if there is

no deficiency, the [creditor] has lost nothing but a theoretical right").

**23.** Several commentators, to illustrate this point, have postulated the case of a sole proprietor who, although insolvent, is paid for the sale of his interest to a new entity. While his prospects are improved, because he is paid for a valueless interest, the sale nonetheless "alters" his rights and leaves him impaired. *See, e.g.*, H. Miller & M. Cook, A Practical Guide to the Bankruptcy Reform Act 548 (1980); Trost, "Business Reorganizations Under Chapter 11 of the New Bankruptcy Code," 34 Bus.Law 1309, 1331–1332 (1979). Likewise, "[t]he most striking distinction between Section 107 of the Act and Section 1124 of the Code is that a class of interests which were valueless because the total assets of the debtor were insufficient to satisfy prior claims was not materially and adversely affected by a Chapter X plan, even though the plan terminated the interests of the class, whereas such a class is quite clearly 'impaired' under Section 1124." 5 Collier on Bankruptcy ¶ 1124.02 at 1124–9 (15th ed. 1980). Collier might have added that impairment in this case is not attributable to a lack of equity but to the termination of the class. Similarly, Collier notes, in connection with his discussion of Section 1129(b), that a "class [of shareholders] would be impaired if the plan amended the charter and restricted dividends, or if the plan provided for a sale of all of the assets of the debtor at less than a full going concern price." *Id.* ¶ 1129.03(4)(d) at 1129–56 n. 29. It is the sale of the assets, regardless of the price at which they are sold, which alters the rights and leads to impairment. In the same vein, a dilution of stock, absent the infringement of preemptive rights, would not impair a class of shareholders. *Compare Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary*, 94th Cong., 2d Sess., Ser. No. 27, pt. 3, at 2195–2196 (1976).

mine impairment.[24 & 25] By driving a wedge between the concept of impairment and the vagaries of value, parties may know with greater certainty, whether or not they are impaired. This certainty should reduce litigation and aid negotiation toward a plan, the goals which Section 1124 was established to further. *Cf.* 3 Nortons Bankruptcy Law and Practice, Section 62.05 at 8–9 (1980).[26 & 27]

**24.** Two amendments to Section 1124 demonstrate this aversion to valuation hearings. First, under Section 1124(3), an option to cash out claims using "property" or "securities" was eliminated because "determination of their value would require a valuation of the business being reorganized. Use of them to pay a creditor...without his consent may be done only under Section 1129(b) and only after valuation of the debtor." H.Rep.No.95–595, 95th Cong., 1st Sess. 408 (1977). Only cash may be used under Section 1124(3) as enacted. Second, under Section 1124(3), an option to cash out interests by paying their "value" was also eliminated: "The effect of the House amendment is to permit an interest not to be impaired only if the interest has a fixed liquidation preference or redemption price. Therefore, a class of interests such as common stock, must either accept a plan under Section 1129(a)(8), or the plan must satisfy the requirements of Section 1129(b)(2)(C) in order for a plan to be confirmed." 124 Cong.Rec. H11,103 (daily ed. September 28, 1978). *Compare* H.Rep.No.95–595, 95th Cong., 1st Sess. 408 (1977). *See generally* 5 Collier on Bankruptcy ¶ 1124.01 (15th ed. 1980). Section 1124(3)(A) may be an exception to the no-valuation rule where there is a dispute concerning the amount of a secured claim. This requires a valuation of the collateral. *See* 11 U.S.C. Section 506(a). Such a dispute would arise, however, where the debtor believes the creditor is undersecured and wants to cash him out for the amount of the lien rather than the debt. In most instances, when this occurs, the creditor can resort to 11 U.S.C. Section 1111(b) and render the problem of valuation irrelevant.

**25.** This emphasis on rights instead of values is reminiscent of equity receivership practice: "in an equity receivership a mortgagee may foreclose without allowing the junior creditors or stockholders any interest in the reorganized company, and evidence that the value of the property is greater than the mortgage debt is not admissible. The only way in which the junior securityholder can preserve a continuing interest in the mortgaged property, as of right, is by paying the full amount due to the senior mortgagee. Similarly, unsecured creditors are not obliged to allow stockholders to participate in a reorganization plan dealing with the un-

## The Relation of Section 1124 and Section 1129(b)

Section 1124 may be read not only formalistically but also functionally.[28] The functional approach is not a regression to the material and adverse effect standard. Rather, it defines impairment in terms of the protections afforded creditors under Section 1129(b), *i.e.*, a claim is impaired

mortgaged assets, regardless of the value of such assets. The creditors may pursue their legal and equitable remedies, and the only strict right which the stockholders have is to pay in full the matured debts of the corporation. In these respects the finality of the judicial sale is absolute." T. Finletter, The Law of Bankruptcy Reorganization, *supra* at 415–416.

**26.** Another difference between the materially and adverse effect standard and impairment is that, under the Act, if a claim was not materially and adversely affected, it did not count. Similarly, under the Code, unimpaired claims may not vote. Under the Act, however, the creditor could nevertheless invoke the absolute priority doctrine, obtain a valuation hearing, and question his exclusion from the plan. Under the Code, an unimpaired class is deemed to have accepted a plan, and may be disenfranchised on the issue of absolute priority. *Cf.* 3 Nortons Bankruptcy Law and Practice, *supra* Section 62.05 at 8. *See also* discussion *supra*, note 18, at 959, and *infra,* note 35, at 967 and 38, at 968.

**27.** The bank may be impaired for another reason. There is an indication in the record, although unclear, that it supplied interim financing to all or a phase of the project. Hancock was to furnish permanent financing. To the extent the plan transforms this interim into a permanent lending commitment (because of 11 U.S.C. Section 365(c)(2) Hancock cannot be forced to make further financial accommodations to debtors) the rights of the bank may be altered and it may be impaired. *Cf. In re Nob Hill Apartments*, 2 B.C.D. 1463 (N.D.Ga.1976); ABA, "Structuring and Documenting Business Financing Transactions Under the Federal Bankruptcy Code of 1978," 35 Bus.Law. 1645, 1660 (1980); Note, "Real Estate Reorganizations: The New Bankruptcy Code v. Chapter XII," 1980 The Ill.L.For. 251, 275.

**28.** The analysis of Section 1124, outlined above, is of course functional in the sense that it furthers the goal of negotiated plans. But this is accomplished indirectly. The discussion below defines impairment in terms of its relation with Section 1129(b).

where necessary to prevent wrongs which are redressable under Section 1129(b).

It is unnecessary in this case to decide whether all of the protections implicit in Section 1129(b), including the absolute priority rule, bear upon this case.[29] At least the present value requirement of Section 1129(b)(2)(A)(i)(II) is implicated. That section provides:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides

(i)(I) That the holders of such claims retain the lien securing such claims, whether the property subject to such lien is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) That each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

The present value requirement is based upon the principle that a dollar today is worth more than a dollar tommorrow. How much more is determined by a complex of factors which, while qualitative in nature, are quantified in a discount rate. Collier has formularized these factors with the observation "that deferred payment of an obligation under a plan is a coerced loan and the rate of return with respect to such loan must correspond to the rate which would be charged or obtained by the creditor making a loan to a third party with similar terms, duration, collateral and risk.

It is therefore submitted that the appropriate discount rate must be determined by reference to the 'market' interest rate." 5 Collier on Bankruptcy ¶ 1129.03(4)(e)(i) at 1129 (15th ed. 1980). *Accord*, Klee, "All You Ever Wanted To Know About Cram Down Under The New Bankruptcy Code," *supra* at 158 ("The discount rate is equivalent to the rate of interest that would be paid on an obligation of the debtor considering a market rate of interest that reflects the risk of the debtor's business"); *In the Matter of Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 6 B.C.D. 1312, 1314 (Bkrtcy.D.N.J. 1980). This leaves, of course, the question of relevant market. But more important, it ignores the uneasy relation of market and reorganization values. Indeed, "[n]ot only is [reorganization value] different from valuation by the market," according to Blum, "but it can be understood fully only when contrasted with market value." So also is "[t]he worth of the new securities [issued under a plan] not to be tested by reference to market quotations because that yardstick is patently inconsistent with predicating the plan on reorganization values." In short, "[r]eorganization value is what some appraisers believe the current market value of the distressed company ought to be if the present were like the future they foresee. It is thus a liberalization of market price corresponding with some expert opinions about the inherent value of the enterprise." Blum, "The Law and Language of Corporate Reorganization," *supra* at 565, 578–582. The market may also overlook the purpose of Section 1129(b)(2)(A)(i)(II) to protect creditors from loss rather than to augment their opportunity for profitmaking under a plan. Moreover, it may give insufficient weight to the continuing jurisdiction of the court and other protective features of the Code, as well as the rehabilitative ideal.[30]

---

**29.** The court is aware that the absolute priority rule, as traditionally construed, does not apply to secured lenders in Chapter 11. Section 1129(b)(2)(A) may have the same or a similar effect, however, by requiring full compensation for their claims. *See, e.g.*, Note, "Real Estate Reorganizations: The New Bankruptcy Code v. Chapter XII," 1980 The Ill.L.For. 251, 264–275.

**30.** The House Report observed that "[n]ormally, the interest rate used in the plan will be prima facie evidence of the discount rate because the interest rate will reflect an arms-length determination of the risk of the security involved and feasibility considerations will tend to understate interest payments." H.Rep.No. 95 595, 95th Cong., 1st Sess. 415 (1977), U.S.

Code Cong. & Admin.News 1978, p. 6371. This view, according to Collier, "is correct only in the context where the class of claims has accepted the plan and the court is trying to determine whether the class is being provided for more than in full. Clearly, for purposes of Section 1129(b), the interest rate used in the plan is *not* prima facie evidence of the discount rate because there is no arms length determination of the risk since the requisite majority of the particular class against which Section 1129(b) is imposed has not accepted the plan and thus the rate specified in the plan is not part of a 'bargain.' " 5 Collier on Bankruptcy ¶ 1129.03(4)(e)(i) at 1129–61 (15th ed. 1980) (emphasis in original). The House Report, however, is probably referring to the *pre-petition* arms-length bargaining which created the loan. Its observation, especially when coupled with the remark that feasibility requirements "understate" the rate of interest, suggests that *present value* should be construed in a reorganization and not a market context.

A similar point, and perhaps the legislative rationale for pegging present value to the contract rate, are expressed in Blum, "Full Priority and Full Compensation in Corporate Reorganizations," 25 U.Chi.L.Rev. 417, 423–424 (1958) where he discusses the "investment" mode of valuing claims for purposes of the absolute priority rule: "Consider, in this connection, a bond bearing a rate of interest low in the light of current enterprise and market conditions. If the bond has matured naturally, there surely is no justification for treating the holder as having in reorganization a claim less than the principal sum. Such a result would amount to compelling him to extend his bad bargain without any compensation. But is a different conclusion in order where the bond has matured solely because of a default or the inauguration of reorganization proceedings? The argument for perpetuating the bondholder's inferior investment position in this situation is that the enterprise in fact continues as a consequence of reorganization. The process in effect is analogized to a moratorium: preserving the *investor's status would be like a mere exten*sion of his old security. It can be granted that moratory relief in respect to a distressed corporate debtor might be regarded as equitable. Bankruptcy reorganization, however, is not predicated on that principle, and in the usual case the creditor will not be permitted, for reasons of feasibility, to retain his former rights. It is thus a long jump from enforcing creditor's rights through reorganization to employing a moratory image of fairness in judging reorganization plans. A bond which has a relatively low interest rate has this inferior aspect either because interest rates generally have increased since its issuance or because the risk represented by it is rated as greater than at its inception. To the extent the inferiority is related to a deterioration in the credit of the enterprise, the case for giving effect to default rights in reorganization is clear cut. It was precisely such inferior conditions, if anything, which were uppermost in the minds of investors who purchased securities calling for preferred payment in full in case of default. As to weakness in the bond due to a rise in the pure rate of interest, no comparable point is involved. The strength of the bondholder's case must rest on the principle that reorganization is a substitute for liquidation and in a liquidation the creditor is free to reinvest the proceeds at the current rate of interest.

"The reported cases hardly discuss the problem of evaluating the claim for which an inferior quality security is entitled to be compensated in full. The explanation probably stems in large part from our avoiding use of dollar values or relying heavily on intrinsic values not precisely defined. Suppose it is decided to give a new bond 'intrinsically worth' $1000 in exchange for each old $1000 bond. How would one determine the appropriate interest rate for the new issue? Current market rates may, as we have seen, be ignored, if desired, since they can always be dismissed as transitory conditions. Alternative guides for the choice prove to be either illusory or indeterminate. Under these circumstances might not the interest rate on the old security be as logical (and certainly as convenient) a standard as any other that comes to mind? The suggestion is that when the terms of the old securities, other than liquidation preferences, are taken into account, they may be utilized not in measuring the claims assertable, but as a prop in ascertaining the amount of compensation which passes as being 'full.' Thus while the investment quality of old inferior securities enters into some of the cases, an investment value doctrine of priorities may not have been at work."

Blum, in another article, "Corporate Reorganizations Based on Cash Flow Valuations," 38 U.Chi.L.Rev. 173, 177–178 (1970), criticizes the SEC approach to selecting discount rates for cash flow in terms which underline the disparity in reorganization and market value: "Perhaps the most serious weakness is the cavalier fashion in which the Commission arrived at a rate for discounting the projected cash flow attributable to the claims of unsecured creditors. The justification offered for making present value calculations on an assumed 8% rate is that '[t]his is the rate for the secured creditors. The unsecured creditors whose position is much riskier are certainly entitled to at least that same 8% rate.' Such an explanation is unsatisfying. In saying that 'this is the rate for secured creditors,' the Commission apparently was doing no more than acknowledging the fact that under the proposed plan the bank, 'by far the largest secured creditor, will be entitled to interest at the prime rate plus 1% but in no event less than 7% per annum.' *This is not equivalent to finding that a new loan would be made on those terms at the time the Commission was reviewing the plan. A lender*

Nevertheless, one element of present value, whether or not it is calculated on the basis of a market rate, is risk. One element of risk is the identity of the obligor and his ability to perform the conditions of a plan. By changing obligors, debtors may have altered the complexion of risk and hence of present value.[31] The bank therefore is impaired because it needs the protection of Section 1129(b).

Impairment, in this sense, also may be indicated by analogy to sales of property under 11 U.S.C. Section 363(b) and the assignment of executory contracts under 11 U.S.C. Section 365(f). If property is sold under Section 363(b), a creditor may demand adequate protection. If a contract is assigned under Section 365(f), a creditor is entitled to "adequate assurance of future performance by the assignee." It is anomalous if the debtors may not sell property under Section 363, or assign a contract under Section 365(f), events which alter the identity of obligors, without adequately protecting or adequately assuring the bank, but may sell the property and use Section 1124 to avoid the protection afforded by Section 1129(b).[32]

*not already committed and not faced with the difficulties of collecting a defaulted loan might well demand a higher return, and that figure would be the better gauge of market conditions.* But even if 8% turned out to be the proper rate for discounting that part of the projected cash flow associated with the claims of secured creditors, 8% could not conceivably also be the proper rate for discounting the estimated cash flow associated with the claims of unsecured creditors. In any business enterprise a projected second layer of cash flow is less certain to be realized than the top tier, and this is all the more so in the case of a risky venture." (Emphasis supplied.)

31. The discount rate to determine present value is not unlike capitalization rates employed in enterprise valuations under the absolute priority rule. One commentator has noted that "[t]he proper measurement of the rate of capitalization is a matter of some uncertainty. *It is generally considered to be a discount rate reflecting opportunity cost.* The rate of capitalization allows for an interest factor and a risk factor." Bell, "Valuation and Probability of Bankruptcy in Chapter X," 52 Am.Bankr.L.J. 1, 14 (1978) (emphasis supplied). *Accord,* W. Blum & S. Kaplan, Materials on Reorganization, Recapitalization, and Insolvency 336 (1969) ("A 'capitalization rate' is ... a 'discount rate' applied to a perpetuity"). This estimate "embraces all facts relevant to future earning capacity *and hence to present worth,* including, of course, the nature and conditions of the properties, the past earnings record, and *all circumstances which indicate whether or not that record is a reliable criterion of future performance." Consolidated Rock Products Co. v. DuBois,* 312 U.S. 510, 526, 61 S.Ct. 675, 685, 85 L.Ed. 982 (1941) (emphasis supplied). These circumstances include all "relevant information about the company and its affairs, including data concerning its present and past physical and financial condition, *the competence and fidelity of its management,* the causes of its financial collapse, and its past operating record and policies, adjusted for unusual or non-recurring conditions or items..... *management and operating policies, past and prospective, are subjected to careful analysis to determine their effect upon earnings."* Gardner, "The SEC and Valuation Under Chapter X," 91 U.Pa.L.Rev. 440, 444–445 (1943) (emphasis supplied). Collier notes that "[t]he rate of interest on a dollar is determined by the identity of the lender, the duration of the loan, and the market's perception of risk." 5 Collier on Bankruptcy ¶ 1129.03(4)(e)(i) at 1129–59 (15th ed. 1980). Surely the identity of the obligor is as important as the identity of the lender in determining present value. *See also id.* at 1129–59—1129–60 n. 32; Blum, "The Law and Language of Corporate Reorganization," *supra* at 580. *See generally* V. Brudney & M. Chirelstein, Cases and Materials on Corporate Finance 1–81 (1972).

32. A similarly suggestive contrast may be drawn between 11 U.S.C. Section 541(c)(1) and Section 363(l). Section 541(c)(1) removes two kinds of restrictions on the transfer of property from debtor to estate when a petition is filed: the so-called bankruptcy clauses and any contract provision "that restricts or conditions transfer of [property from debtor to the estate]." Section 363(l), on the other hand, removes one kind of restriction on the sale of property from the estate to third parties, either under Section 363(b) or under a plan, *viz.,* bankruptcy clauses. Section 363(l), unlike Section 541(c)(1), does not neutralize contract provisions which "restrict or condition" transfers of property. Thus, such provisions are operative when property moves from but not into the estate. The legislative history suggests that this distinction between Section 541(c)(1) and Section 363(l) was made by design. *See* H.Rep.No.95–595, 95th Cong., 1st Sess. 346 (1977); 124 Cong.Rec. H11,093 (daily ed. September 28, 1978). The rationale may be that bankruptcy clauses, which are concerned with the financial ability of the debtor, should not impede reorganization, but that restrictions on

*Conclusion*

The court is mindful that the two approaches to impairment articulated in this opinion may be inconsistent. A class of claims, for example, may be impaired under the first but not the second approach. Moreover, the second approach, which defines impairment in terms of the protections vouchsafed under Section 1129(b), and which therefore, under some circumstances, may interpose the uncertainties of value, could defeat the objectives of the first approach, to reduce litigation and to further negotiation of plans. These possibilities may require a determination whether the two approaches are optional in any case or mutually exclusive in all cases. The facts of this case, however, permit a holding of impairment under both approaches and these questions are left for another day.

## CONFIRMATION UNDER SECTION 1129(a)(10)

■ Section 1129(a)(10) forbids confirmation unless "[a]t least one class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim of such class."

In this case there are four classes of claims and there is no class of interests.[33] Three of the four classes of claims are unimpaired.[34] The fourth is impaired but has rejected the plan. Section 1129(a)(10) can be met only if the term "acceptance" includes deemed acceptance by an unimpaired class under Section 1126(f) as well as affirmative acceptance by an impaired class under Section 1126(c).

This problem arises from the contradictory inferences which may be drawn from Section 1126(f) and Section 1129(a)(8). Section 1126(f) provides that an unimpaired class "is deemed to have accepted the plan," suggesting that unimpaired classes may be counted under Section 1129(a)(10). Section 1129(a)(8), however, requires that "with respect to each class—(A) such class has accepted the plan; or (B) such class is not impaired under the plan," suggesting a distinction between nonimpairment and acceptance and therefore a divergence between unimpaired classes and the standard of Section 1129(a)(10).

"Ultimately," according to Collier "this issue will be determined by the courts." 5 Collier on Bankruptcy ¶ 1129.02(10) at 1129–31 (15th ed. 1980). To date, however, only three opinions on this point have been published. In *In re Bel Air Associates, Ltd.*, 4 B.R. 168 (Bkrtcy.W.D.Okla.1980) the court, without discussing the conflicting implications of Section 1126(f) and Section 1129(a)(8), ruled that an unimpaired class counts under Section 1129(a)(10). In *In re Marston Enterprises, Inc., Spring Run Apartments*, 13 B.R. 514, 7 B.C.D. 1403 (Bkrtcy.E.D.N.Y.1981), the court held: "Section 1129(a)(10) requires that one class of impaired claims must actively accept the plan." *Id.* at 1407. Alternatively, it viewed a deemed acceptance under Section 1126(f) as presumptive and therefore rebuttable, distinguishing *Bel Air* with the observation that there the unimpaired creditor had not rebutted the presumption by affirmatively rejecting the plan.[35] "To deem

---

33. The classes are (1) priority claims, (2) unsecured claims, (3) Hancock, and (4) the bank. *See supra* note 5, at 954.

34. The priority and unsecured claims are unimpaired. *See* discussion *supra* at 954–955. Hancock is described as unimpaired but arguably it is impaired for the same reasons the bank is impaired. *See* discussion *supra* at 955–966. Since it has not objected to its description as unimpaired, however, it is treated as such for purposes of analysis under Section 1129(a)(10).

35. This distinction, however, may be questionable. The court points, in part, to Section 1126(a) which says that the holder of a claim or

transfer, which are concerned with the financial ability of transferees, should not be overturned without compensatory treatment for the creditor. This is consistent with Sections 363(d), 363(e), and 365(f), as discussed above, as well as Section 1124 in relation to Section 1129(b). *See also* 11 U.S.C. Section 365(c)(1): "This provision seems designed to apply particularly to.... the sale of real property." ABA, "Structuring and Documenting Business Financing Transactions Under the Federal Bankruptcy Code of 1978," 35 Bus.Law. 1645, 1701 (1980).

that a party has accepted a plan when the fact is that it has rejected the plan," it noted, "is Alice in Wonderland reasoning which this court cannot accept." *Id. In re Landau Boat Company*, 13 B.R. 788, 7 B.C.D. 1367 (Bkrtcy.W.D.Mo.1981) followed *Bel Air* and disapproved the reasoning in *Marston* with the assertion that: "if the Congress had intended that there be an affirmative [as distinct from a deemed] acceptance requirement ... it would have been easy enough to insert such a word. The language is not there and should not be implanted by the court." *Id.* at 1368.

Scholarly comment is also divided. Collier suggests that Section 1129(a)(10) is a reconciliation of two lines of cases under Chapter XII of the Act, although the basis or nature of this compromise is not stated.[36] Unimpaired classes should count, in his view, because "[a] contrary construction of Section 1129(a)(10) would compel proponents of a plan to engage in the wasteful process of slightly impairing a class by extension or composition and obtaining the invariable acceptance of that class after a costly solicitation.[37] Indeed, it might be possible to solicit the acceptance of a class that is not impaired since Section 1126(f) states that solicitation is not required rather than prohibited.[38] The purpose of Section 1126(f) was to avoid such an exercise

and it may be argued that Section 1129(a)(10) should be interpreted consistent with that purpose." 5 Collier on Bankruptcy ¶ 1129.02(10) at 1129–32 n. 52 (15th ed. 1980). Similarly, he argues that the reference to impairment in Section 1129(a)(8)(B) "could be considered surplusage included for the convenience of the Court." *Id.* ¶ 1129.02(8) at 1129–33. Some analysts concur. *See, e.g.*, D. Cowan, Cowans Bankruptcy Law and Practice, Section 20.30 at 508 (Int. ed. 1980); H. Miller & M. Cook, A Practical Guide to The Bankruptcy Reform Act 578 & n. 150 (1979); 3 Nortons Bankruptcy Law And Practice, *supra*, Section 63.12 at 14–15; Anderson & Ziegler, "Real Property Arrangements Under the Old and New Bankruptcy Acts," 25 Loy.L.Rev. 713, 721 n. 32 (1979); King, "Chapter 11 of the 1978 Bankruptcy Code," 53 Am.Bank.L.J. 107, 126 (1979); Klee, "All You Ever Wanted To Know About Cram Down Under the New Bankruptcy Code," *supra* at 137–138; Note, "Real Estate Reorganizations: The New Bankruptcy Code v. Chapter XII," 1980 The Ill.L.For. 251, 262–263; Note, "Cram Down Under the New Federal Bankruptcy Code: The Effect of Deemed Acceptance on the Confirmation Standards of Chapter 11," 15 Land and Water Rev. 701, 716 (1980). *Cf.* Lifton, "Real Estate in Trouble: Lender's Remedies Need an Over-

---

interest may accept or reject a plan. Emphasizing the permissive "may," the court concludes that the holder of a claim may vote and that the vote will overrule the deemed acceptance proviso of Section 1126(f). This argument places no weight upon the fact that Section 1126(a) defines the voting rights of claimants whereas Section 1126(f) speaks in terms of classes. It likewise ignores the operation of Section 1126(f) "notwithstanding any other provision of this section." In any event, where a class consists of one creditor and that creditor does not vote, the effect under Section 1126(c) may be rejection of the plan (although the court reserves judgment on this issue). It is unclear what an "affirmative" rejection may add.

**36.** The cases are discussed in Anderson & Ziegler, "Real Property Arrangements Under the Old and New Bankruptcy Acts," 25 Loy.L.Rev. 713 (1979); Dole, "The Chapter XII Cram-Down Provisions," 82 Com.L.J. 197 (1977); Fine, "Unjamming the 'Cram-Down,'" 52 Am. Bankr.L.J. 321 (1978); Gilbert & Massari,

"Chapter XII 'Cram-Down' Bad Medicine or Just Desserts?" 52 Am.Bankr.L.J. 99 (1978); Lifton, "Real Estate in Trouble: Lender's Remedies Need an Overhaul," 31 Bus.Law. 1927 (1976); Macey & Macey, "The Chapter XII Chrysalis," 52 Am.Bankr.L.J. 121 (1978); Merrick & Bufithis, "Chapter XII Why Is It?" 52 Am.Bankr.L.J. 213 (1978); Nicholson, "Chapter XII: Rehabilitation or Resurrection? The Cram-Down and Other Problems," 16 Emory L.J. 489 (1977); Weintraub & Crames, "Chapter XII Comes of Age: Recent Developments," 51 Am.Bankr.L.J. 291 (1977); Note, "Real Estate Reorganizations: The New Bankruptcy Code v. Chapter XII," 1980 The Ill.L.For. 251; Note, "Provisions For Non-Assenting Classes of Creditors in Bankruptcy Reorganizations," 46 Yale L.J. 116 (1936).

**37.** *But compare infra* note 40, at 970.

**38.** *But compare supra* note 18, at 959 and note 35, at 967.

haul," 31 Bus.Law. 1927, 1967–1968 (1976); Note, "From Debtor's Shield to Creditors Sword: Cram Down Under the Chandler Act and the Bankruptcy Reform Act," 55 Chicago-Kent L.Rev. 713, 743–744 (1979). Others disagree. *See, e.g.,* P. Murphy, Creditors' Rights in Bankruptcy, Section 16.11 at 16–20 (1980) ("The only conceivable purpose of Section 1129(a)(10) is to require some indicia of creditor support for the debtor's schemes, and such support can hardly be found based on a 'deemed to have accepted' vote from an unimpaired class which has no real stake in the confirmation process"); Bisbee, "Business Reorganization Practice Under the Bankruptcy Reform Act of 1978," 28 Emory L.J. 709, 748–749 (1979) ("A better rule, however, would be that at least one impaired class must affirmatively accept the plan in order for the plan to be confirmed. The draftsmen of the Code, and Congress in enacting it, took great pains to protect creditors... In view of these protective measures, it is unreasonable to assume that Congress intended that a plan could be confirmed when no class of creditors actually accepts it").

Although the statutes and their interpretation cannot be harmonized, the legislative history offers guidance. Neither H.R.8200 nor S.2266, as initially proposed, contained a measure like Section 1129(a)(10). At hearings, however, representatives of the real estate lending industry voiced several objections to the bills. Their concerns included the cram down provisions which might codify the result in *In re Pine Gate Associates,* 2 B.C.D. 1478 (N.D.Ga.1976) where, under Section 461(11)(c) of Chapter XII, former 11 U.S.C. Section 861(11)(c), an undersecured mortgagee was cashed out at the value of its lien, rather than its claim, while the debtor retained ownership of an apartment complex. The appraisal was conducted at a time of "substantially depressed real estate market conditions." The cash out meant that "the secured creditor [lost] any possibility of recovering the full debt if the real estate market returns to more normal conditions." *Hearings on S.2266 and H.R.8200 Before the Subcomm. on Improvements in Judicial Machinery of the Sen. Comm. on the Judiciary,* 95th Cong., 1st Sess. 720–721 (1977).[39]

The National Association of Real Estate Investment Trusts submitted a memorandum which recapitulated these concerns and proposed, as a cure, an additional standard for confirmation under Chapter 11. This proposal was adopted almost verbatim in what later became Section 1129(a)(10). The rationale for the proposal, because of its importance in this case, will be quoted in full:

Finally, it appears that under section 1130(c)(1)(B)(iii) whatever protection that might exist in terms of requiring cash payment under section 1124 or section 1130(a) is abrogated by permitting confirmation over the objection of any class member or, for that matter, any class, as long as they receive "property" of a value equal to the allowed amount of their claims. The "property" could be anything—notes, stock, bonds or the like. Indeed, it appears that if the debtor is

---

**39.** Moreover, real estate limited partnerships may not be sympathetic debtors. They are composed, for the most part, of "wealthy individuals seeking tax shelter." Indeed, the petition in bankruptcy is filed to prevent the recapture of accelerated depreciation as ordinary income in the year of foreclosure. One author notes that the partnerships are "formed to provide tax-shelter benefits, minimum risk, and substantial returns if the projects were successful. Through leveraging, the general and limited partners had avoided substantial investment of personal funds. On the other hand, the mortgagees were fixed return lenders who had restricted their security to the real property, exculpated the general partner and the borrowing entity as to any other assets, and taken no personal guarantees. Furthermore, if the mortgagee were to realize on contractual rights to foreclose, no jobs would be lost, no public service affected, and economic dislocation caused by the continuing default of the mortgagor would be terminated." Nicholson, "Chapter XII: Rehabilitation or Resurrection? The Cram Down and Other Problems," 26 Emory L.J. 489, 520 (1977). *See also* Lifton, "Real Estate in Trouble: Lender's Remedies Need an Overhaul," *supra.* This combination of circumstances, it was believed, did not warrant relief under the debtor rehabilitation provisions of the Code.

solvent it need not obtain any votes in favor of the plan since all of its creditors could, in one fashion or another, be covered under section 1124, section 1130(a)(8), or section 1130(c). This section should be amended to be consistent with the rest of S.2266 and *in particular confirmation should not be permitted in situations where no class of affected creditors has voted for the plan.* Consideration should also be given to affording secured creditors the same absolute priority protection given to unsecured creditors under section 1130(c)(2)(B)(iv), although as we have discussed above the valuation process may render such protection illusory. We suggest the following: ... Add a new subparagraph (12) to section 1130(a) which would read: "(12) At least one class of claims has accepted the plan, such determination to be made without including any claims held by insiders for purposes of number or amount." *Hearings on S.2266 and H.R.8200 Before the Subcomm. on Improvements in Judicial Machinery of the Sen. Comm. on the Judiciary,* 95th Cong., 1st Sess. 721 (1977) (emphasis supplied).

Section 1129(a)(10) was interposed so that confirmation would be disallowed "in situations where no class of affected [*i.e.,* impaired] creditors has voted for the plan." At that time, the bills did not contain a deemed acceptance provision for unimpaired classes. Thus, Section 1129(a)(10) accomplished its objective as drafted. The subsequent addition of Section 1126(f) rendered unclear the language of Section 1129(a)(10), but did not obscure its intent as articulated in the legislative record.[40]

Although the policy underlying Section 1129(a)(10) and its role in answering the concerns of the real estate lending community may be questioned, and while the logic of counting an unimpaired class may be persuasive, the congressional mandate that affirmative acceptance by at least one impaired class is necessary cannot be ignored. Accordingly, the plan, as presently proposed, must be denied confirmation.[41]

---

**40.** This conclusion is underscored by the Technical Amendments to the Bankruptcy Reform Act of 1978 where Section 1129(a)(10) is rewritten and clarified to state: "If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan [must accept] the plan, determined without including any acceptance of the plan by an insider." The Senate Report explaining this change goes further by noting that "this amendment makes clear the intent of Section 1129(a)(10) that one 'real' class of creditors must vote for

the plan of reorganization. A class that is deemed to have accepted the plan because it is unimpaired or acceptance of a small class of claims permitted to be created for administrative convenience will not satisfy this requirement." Sen.Rep.No.96–305, 96th Cong., 1st Sess. 15 (1979).

**41.** This case does not raise and the court does not reach the issue whether a plan where *all* classes are unimpaired could be confirmed in light of Section 1129(a)(10).