**In re BATAA/KIERLAND, LLC, Debtor.**

**No. 2:11–bk–05850–RJH.**

United States Bankruptcy Court, D. Arizona.

Sept. 4, 2012.

John J. Hebert, Mark W. Roth, Mary B. Martin, Philip R. Rudd, Polsinelli Shughart, P.C., Phoenix, AZ, for Debtor.

## AMENDED OPINION DENYING DESIGNATION OF VOTE

RANDOLPH J. HAINES, Bankruptcy Judge.

A secured creditor has moved to "designate," or disqualify, another secured creditor's acceptance of the plan of reorganization, pursuant to Bankruptcy Code § 1126(e),[1] alleging that the acceptance was not in good faith. The Court denies the motion as untimely and moot and because there is no evidence the vote was cast out of malice, for any improper purpose, or for any reason other than enlightened self-interest consistent with both the voter's and the plan proponent's capacities in the bankruptcy case.

### Factual and Procedural Background

This is a single asset real estate case. The Debtor, Bataa/Kierland LLC, is the owner of modern, class A office building and surface parking lot with an easement that provides additional parking in an adjacent parking structure owned by the Debtor's affiliate. The Debtor's building is subject to a lien in favor of JPMCC 2007–CIBC Greenway LLC (the "Lender"), who purchased the secured debt from Bank of America, who had acquired the debt from the Canadian Imperial Bank of Commerce. The Lender rejected the Debtor's plan of reorganization.

---

1. Except as otherwise indicated, all chapter, section and rule references are to the United States Bankruptcy Code, 11 U.S.C. §§ 101– 1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

Maricopa County held a real property tax claim against the Debtor that was secured by a senior lien on the Debtor's property. Maricopa County's claim was impaired, and it accepted the plan.

The acceptance the Lender seeks to disqualify was that of Joseph Annoreno, who had made a pre-petition loan to the Debtor in the amount of $5,000 for the purchase of computer equipment and accessories to be used in the operation of the Debtor's business. Annoreno is the Chief Executive Officer of a tenant of the adjacent building owned by the Debtor's affiliate, and had become friends with the Debtor's principal over the years. Annoreno also owns a holding company that makes small to medium size loans. The Debtor granted Annoreno a security interest in the computer equipment to secure the debt owed to Annoreno, and made payments on that debt for seven months prior to the filing of the bankruptcy case. The Debtor's plan pays Annoreno's allowed secured claim in full, with interest of 5% (less than the 8% rate in the promissory note), over a period of three years, and his unsecured deficiency claim will be treated as a Class 4 unsecured claim. Annoreno accepted the Debtor's plan, and it is this acceptance that the Lender seeks to disqualify as made in bad faith.

The Lender also objected to the classification of Maricopa County's secured tax claim, arguing that it was either not a valid claim at all, that it was not a valid secured claim, or that it was not impaired because it received the treatment required for a priority *unsecured* tax claim, but at the confirmation hearing the Court denied those objections. The Lender also objected to confirmation on the ground that

there was no accepting impaired class so the plan failed to satisfy § 1129(a)(10).[2]

The deadline for submitting ballots on the Debtor's plan was October 19, 2011. The Lender's objection to the plan was filed on October 20. In this 35 page objection the Lender asserted virtually every confirmation objection available to a secured creditor, including the alleged failure of the plan and voting to satisfy § 1129(a)(10). The Lender's primary objections to the acceptance by Annoreno were that his claim was "artificially" impaired because the Debtor could have paid for the computer equipment in full, because there was an artificial, gerrymandering classification that sought to "disenfranchise" the Lender, and because Annoreno may be an insider whose vote does not count for purposes of § 1129(a)(10). As part of the latter objection the Lender stated that Annoreno's refusal to sell his claim to the Lender for the full amount "suggests that any vote in favor of the Plan by Mr. Annoreno was made so that the Debtor would have an accepting impaired class." The objection stated, in one sentence and without citation to any authority, that the Court should "designate any vote in favor of the plan by Annoreno as a bad-faith vote under Section 1126(e)." The objection did not include any motion for designation of the Annoreno vote.

The initial, nonevidentiary hearing on confirmation of the plan was held on October 27, at which time the Court set an evidentiary hearing on confirmation for February 6 and 7, 2012. That hearing was postponed while the parties engaged in mediation. Although the parties reached a global settlement at the mediation, the Lender subsequently rejected that agreement. On March 21, the Court denied the

---

**2.** Section 1129(a)(10) provides: "If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."

Debtor's motion to strike the Lender's objections to the plan as a sanction for failing to mediate in good faith with a party who had sufficient settlement authority, and set a two-day evidentiary hearing on confirmation for May 29–30.

On May 24, the Lender filed a "Supplemental Objection" to the Debtor's plan after the conclusion of discovery. This objection did not object to either the claim or vote of Annoreno, nor seek its designation. The parties filed their joint pre-trial statement on May 25.

At 8:41 am on May 29, the Lender filed its objection to the Annoreno claim and its motion to "designate the vote submitted by Annoreno because the Annoreno claim was strategically incurred for the sole purpose of effectuating a cram-down." The two-day evidentiary hearing on confirmation began thirty minutes later, at 9:10 am.

On July 10, the Court issued a memorandum decision denying the Lender's objections and concluding that the Debtor's plan of reorganization should be confirmed. The final order confirming the plan was entered on August 2. The Lender appealed that order and its appeal is pending before the District Court for the District of Arizona.

Annoreno responded and objected to the Lender's motion to designate the Annoreno vote, and a nonevidentiary hearing on that motion was held on June 20, at which time the Court took the matter under advisement.

### Timeliness

■■■■ Section 1126(e) requires notice and a hearing before the court may desig-nate a vote on plan confirmation.[3] An objection to plan confirmation does not serve as a motion for § 1126(e) purposes, at least in part because the creditor whose vote is being challenged must be given a separate notice. A notice of the designation attempt must occur before confirmation to provide the "chance to summarily address such allegations, with some advance notice, however limited."[4]

■■■■ The first issue in this case then becomes whether the motion to designate was timely, coming seven months after the balloting and the first hearing on confirmation, and just minutes before commencement of the final evidentiary hearing on confirmation. The acceptances by classes and the satisfaction of § 1129(a)(10) were determined at the May 29–30 final confirmation hearing, long before Annoreno was given any notice of a hearing on the Lender's attempt to disqualify his vote. The Lender was required to give notice to Annoreno that a hearing was going to be held to designate his vote before the conclusion of the confirmation hearing.

Nor was the motion to designate identified as an issue to be tried at confirmation in the Joint Pre-Trial Statement filed by the Lender and the Debtor. The Lender did identify in the Joint Pre-Trial Statement its contention that Annoreno's acceptance of the plan was not submitted in good faith, but did not give notice, and certainly none to Annoreno who was not a party to this Joint Pre-Trial Statement, that the § 1126(e) motion would be heard as part of the confirmation hearing. Since designation did not appear in the Joint Pre-Trial Statement for the confirmation

---

**3.** Section 1126(e) provides: "On request of a party in interest, and *after notice and a hearing,* the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provi-sions of this title." (emphasis added). *See In re Embrace Sys. Corp.,* 178 B.R. 112, 121–122 (Bankr.W.D.Mich.1995).

**4.** *Id.* at 121.

hearing, and there was no notice to Annoreno nor hearing on the designation motion prior to the confirmation hearing at which Annoreno's acceptance was counted, the motion is untimely and now moot.

### Mootness

■ The motion to designate is also moot because the acceptance by Maricopa County satisfies § 1129(a)(10). Given the acceptance by Maricopa County, it will make no difference to confirmation of the plan whether Annoreno's vote is counted or not.

The Court recognizes, however, that the Lender has appealed the confirmation order, and that appeal will undoubtedly include the Lender's argument that the acceptance by Maricopa County cannot satisfy § 1129(a)(10). If the Court's denial of that argument is reversed on appeal, the acceptance by Annoreno would provide the only class capable of satisfying § 1129(a)(10). It therefore may serve judicial economy to address now the merits of the designation motion, even though it is moot.

### Classification of Annoreno's Claim

The Lender makes several arguments that Class 2D, consisting solely of Annoreno's claim, cannot satisfy § 1129(a)(10) even if Annoreno's acceptance is allowed. For example, the Lender argues that Annoreno's claim could have been paid in full by the Debtor prior to the filing of this bankruptcy case, so the plan's payment of this claim over time constitutes "artificial impairment" or gerrymandering that cannot satisfy § 1129(a)(10).

■ Although "gerrymandering" is neither defined nor mentioned in the Bankruptcy Code, it has been used as a term of art in some bankruptcy cases to describe a very particular prohibited practice in the Chapter 11 plan confirmation process.[5] According to most courts that have employed the term in the confirmation context, including the Ninth Circuit, "gerrymandering" is the placement of substantially similar claims in separate classes for the sole purpose of obtaining acceptance of the plan by at least one impaired class to satisfy Code § 1129(a)(10).[6] Once it is determined that separately classified claims are dissimilar under § 1122, however, "there is no basis or reason to consider the Debtor's motives underlying such classification, whether they be gerrymandering or for business reasons, because the Code requires such separate classification regardless of the Debtor's motive."[7] In short, classification of a secured claim, which must be separately classified pursuant to § 1122, cannot possibly constitute "gerrymandering" as that term has been used in the reported case law.

■ Moreover, it is not "the bankruptcy court's role to ask whether alternative payment structures could produce a different scenario in regard to impairment of

---

5. *E.g., Save Our Springs (S.O.S.) Alliance, Inc. v. WSI (II)–COS, LLC (In re Save Our Springs (S.O.S.) Alliance, Inc.),* 632 F.3d 168, 174 (5th Cir.2011) ("[D]ebtors cannot place claims into separate classes to gerrymander the vote- that is, to create an impaired class that will approve the plan.").

6. *In re Red Mountain Mach. Co.,* 448 B.R. 1 (Bankr.D.Ariz.2011). *See, e.g., Barakat v. Life Ins. Co. of Va. (In re Barakat),* 99 F.3d 1520, 1526 (9th Cir.1996) ("a debtor cannot 'classify similar claims differently in order to gerrymander an affirmative vote in a reorganization plan.' "), citing *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture),* 995 F.2d 1274, 1279 (5th Cir.1991) and *Oxford Life Ins. Co. v. Tucson Self–Storage, Inc. (In re Tucson Self–Storage, Inc.),* 166 B.R. 892, 897 (9th Cir. BAP 1994).

7. *In re Loop 76, LLC,* 442 B.R. 713, 716 (Bankr.D.Ariz.2010), *aff'd,* 465 B.R. 525 (9th Cir. BAP 2012).

classes." [8] In *Anaheim,* the Ninth Circuit rejected the very concept of "artificial impairment" because § 1124 does not differentiate between artificial and actual impairment.[9] If a claim is properly classified and the plan modifies the creditor's state law rights, there is no reason to inquire into the motive for that claim's treatment under the plan.[10]

■ Here, the Debtor presented evidence that Annoreno had been granted a pre-petition security interest in certain computer equipment and accessories used in connection with the operation of the Debtor's business in exchange for the loan to purchase them. It is apparently undisputed that the Debtor made payments on the secured debt for approximately seven months prior to the bankruptcy filing. Annoreno's claim is a perfected secured claim, and the Lender presented no evidence to the contrary. In fact, during oral argument, counsel for the Lender dropped its claim objection and admitted that Annoreno's claim was both properly secured and properly classified. On these facts, there is no basis under the language of the Code or Ninth Circuit precedent to conclude that § 1129(a)(10) has not been satisfied on a theory of gerrymandering or artificial impairment.

Along with Maricopa County, Annoreno's claim is both properly classified and impaired under the plan, so Annoreno's acceptance also satisfies the § 1129(a)(10)

requirement unless that acceptance is disqualified pursuant to § 1126(e).

### Annoreno's Good Faith

Section 1126(e) provides that "[o]n request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title." The language of the Code does not specify the consequences of so "designating" an acceptance, but the origins and history of the provision make clear, and the Ninth Circuit had held, that "In this context, designate means disqualify from voting." [11]

But the meaning of "good faith," as used in § 1126(e), was also intentionally left undefined by Congress.[12] So courts must consider the context of the historical use of the term to ascertain its meaning, and then apply the "data of practical human experience" and the court's own "perspicacity derived from the data of its informed practical experience in dealing with bankrupts [sic] and their creditors" [13] to determine whether that good faith is lacking under the facts.

■ In *Figter,* the Ninth Circuit held that bad faith occurs when a person seeks to secure some "untoward advantage" over other creditors for some "ulterior" reason.[14] The *Figter* opinion essentially equ-

---

**8.** *Conn. Gen. Life Ins. Co. v. Hotel Assocs. of Tucson (In re Hotel Assocs. of Tucson),* 165 B.R. 470, 475 (9th Cir. BAP 1994).

**9.** *L & J Anaheim Assocs. v. Kawasaki Leasing Int'l, Inc. (In re L & J Anaheim Assocs.),* 995 F.2d 940, 942 (9th Cir.1993).

**10.** *Id.* at 943.

**11.** *Figter Ltd. v. Teachers Ins. and Annuity Assoc. of Am. (In re Figter Ltd.),* 118 F.3d 635, 638 (9th Cir.1997). *Accord, Insinger Mach*

*Co. v. Fed. Support Co. (In re Fed. Support Co.),* 859 F.2d 17, 19 (4th Cir.1988).

**12.** "The Bankruptcy Code does not further define the rather murky term 'good faith.' That job has been left to the courts." *Figter,* 118 F.3d at 638.

**13.** *Id.* at 639–40.

**14.** *Id.* at 639.

ated a lack of good faith with "ulterior motive," and then struggled to define ulterior motive. The opinion apparently derived the "ulterior motive" definition of bad faith from the history of the origins, drafting and application of the predecessor of § 1126(e). But while that equation of bad faith with ulterior motive can in fact be found in the history of the adoption and application of the Bankruptcy Act's predecessor to § 1126(e), the *Figter* opinion itself did not provide that history. Instead, it only referenced a Supreme Court opinion, *Young v. Higbee,*[15] which in dictum and a footnote recited some of that history but never used the term "ulterior motive." Yet in the very next sentence after the paragraph discussing *Young v. Higbee,* the *Figter* opinion made its statement that bad faith is found in the effort "to secure some untoward advantage over other creditors for some ulterior motive."[16]

In *Figter* itself, the debtor appealed the bankruptcy court's ruling that a pre-petition secured creditor's purchase and voting of twenty-one unsecured claims was in good faith, which resulted in the debtor's plan being rendered unconfirmable because it was unable to satisfy § 1129(a)(10), even though the plan provided for full payment of the creditor's oversecured claim.[17] On appeal, the Ninth Circuit upheld the bankruptcy court's finding of good faith because the creditor "acted in a good faith attempt to protect its interests and not with some ulterior motive"[18] when it "bought up most of the Class 3 claims in an effort to protect its own Class 2 claim."[19] To the court, this was not an ulterior motive because it was a "creditor's self interest as a creditor [rather than] a motive which is ulterior to the purpose of protecting a creditor's interest."[20] The court reasoned:

> [T]he mere fact that a creditor has purchased additional claims for the purpose of protecting his own existing claim does not demonstrate bad faith or an ulterior motive. "As long as a creditor acts to preserve what he reasonably perceives as his fair share of the debtor's estate, bad faith will not be attributed to his purchase of claims to control a class vote."[21] (citation omitted).

The *Figter* opinion also held that good faith is a fluid standard that is not controlled by one single factor or set of factors. "[T]he bankruptcy court must simply approach each good faith determination with a perspicacity derived from the data of its informed practical experience," while at the same time differentiating between "a creditor's self interest as a creditor and a motive which is ulterior to the purpose of protecting a creditor's interest."[22]

Although the *Figter* opinion never explicitly defined "ulterior," nor what the bad faith motive must be ulterior to, the numerous examples mentioned leave the inescapable conclusion that the Ninth Circuit required the disqualifying "ulterior" motive to be ulterior to the creditor's status as a creditor. The opinion effectively holds that a creditor's enlightened self interest, *qua* creditor, cannot be deemed ulterior, and that an ulterior motive must

---

15. *Young v. Higbee Co.,* 324 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890 (1945), discussed in *Figter,* 118 F.3d at 638–39.

16. *Id.* at 639.

17. *Id.* at 637.

18. *Id.* at 640.

19. *Id.* at 641.

20. *Id.* at 639.

21. *Id.*

22. *Id.* at 639–640.

be to benefit "some unrelated interest" as opposed to "his interest as a creditor."[23] The disqualifying motive must be one that is "ulterior to the purpose of protecting a creditor's interest."[24]

Other modern cases applying § 1126(e) concur that bad faith is primarily to be found in ulterior motives, and that motives are deemed "ulterior" only when they are ulterior to the creditor's capacity as a creditor. The *Landing* opinion, cited in *Figter*, was quite explicit that § 1126(e) applies only "when the voting process is being used as a device with which to accomplish some ulterior purpose, out of keeping with the purpose of the reorganization process itself, and [is] only incidentally related to the creditor's status *qua* creditor."[25] The Second Circuit's recent decision in *DBSD* concurs, stating that the issue "centers on what sort of 'ulterior motives' may trigger designation under § 1126(e)."[26] In *DBSD*, a competitor without its own pre-petition claim strategically purchased an entire class of claims with the intention of using its votes to acquire the debtor's spectrum rights.[27] The Second Circuit affirmed the bankruptcy court's designation of the competitor's vote because the competitor's motive went beyond the traditional creditor seeking to maximize its return on the pre-petition debt it held. In doing so, the Second Circuit noted that "not just any ulterior motive constitutes the sort of improper motive that will support a finding of bad faith," because "most creditors have interests beyond their claim" that will affect how they vote.[28] For example, trade cred-

itors' votes may properly be influenced by their interest in continuing to do business with the reorganized debtor. And it noted that designation should be employed "sparingly, as 'the exception, not the rule.'"[29]

■ Because Ninth Circuit precedent controls this case, the issue here becomes whether a pre-petition creditor's acceptance of debtor's plan was cast in good faith when the creditor's motive was to see the debtor succeed by supplying the acceptance required by § 1129(a)(10). Stated more simply, the issue is whether it is an ulterior motive for a "friendly" creditor to hold out from having his interest purchased by another claimholder who sought to block the debtor's plan.

To obtain a designation of Annoreno's vote, the Lender has a heavy burden of proof because designation is a narrow exception to the ordinary democratic process, and because bad faith is akin to fraud, which is never presumed. But the Lender has not provided **any** evidence or even argument that Annoreno was acting in any other capacity beyond that of a self-interested creditor. Although the Lender argues that a "friendly" creditor acts in much the same way as a competitor with an ulterior motive, neither the facts of the case nor the analysis and holding of *Figter* support that analogy. Rather, as *DBSD* noted, it is not an ulterior motive for a creditor to be "friendly" to the reorganization because it wants the reorganization to succeed so that it can continue to do busi-

---

23. *Id.* at 639, citing *In re Landing Assocs., Ltd.*, 157 B.R. 791, 803 (Bankr.W.D.Tex. 1993).

24. *Figter*, 118 F.3d at 639.

25. *Landing Assocs.*, 157 B.R. at 807.

26. *Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79, 102 (2d Cir.2011).

27. *Id.* at 104–105.

28. *Id.* at 102.

29. *Id.* at 101.

ness with the reorganized debtor, which is apparently Annoreno's only motive here; at least, the Lender has not suggested any other, improper motive. Moreover, if a creditor can purchase and vote a claim in another class solely because that creditor wants the plan to fail, as in *Figter*, then certainly a creditor can vote its own claim in its own class solely because it wants the plan to succeed. As the origins, history and case law of § 1126(e) suggest, there are many possible explanations for Annoreno's actions that fall short of bad faith.[30] There is nothing to suggest that Annoreno's vote was cast out of any motive other than the kind of self interest that *Figter* found acceptable, and certainly no suggestion of malice, blackmail, competitive motive or attempt to obtain more than Annoreno was entitled to receive on his claim.

Based on this Court's "perspicacity derived from the data of its informed practical experience," and the controlling authority in the Ninth Circuit, this Court finds that Annoreno's vote was cast in good faith, and not for any ulterior motive, for purposes of §§ 1126(e) and 1129(a)(10).

### Bad Faith to Create a Potentially Accepting Class?

The more difficult question may be whether it was bad faith if, as the Lender suggests without evidence, the Debtor purposely created the Annoreno secured claim in contemplation of the bankruptcy filing in order to create an accepting impaired class.

Section 1126(e) contains two distinct grounds for designating a vote—if it was cast by the voter in bad faith, or if its was "solicited or procured" by the plan proponent in bad faith. Here, the former focuses on Annoreno's good faith, while the latter focuses on the Debtor's good faith. Although the Lender's motion never specifically requests designation of the Annoreno vote on the second ground—that it was "solicited or procured" in bad faith—it might be interpreted as seeking designation on either of the alternative grounds,

---

**30.** "The test, then, seems to be whether or not those sought to be disqualified have some 'ulterior' reason for their action which looks to some special advantage or increment to be gained thereby.... On the other hand, as we have said before, the purely selfish or self-interested reasons by which men judge what is best for themselves, even though they may seem unreasonable to others, do not necessarily amount to bad faith. Rule 10–305(d) [amending and implementing Bankruptcy Act § 203] should not be construed to prevent creditors and stockholders from appraising the proposed plan in the light of their own honest desires and their own position. To do so would be anything but the 'democratization' so emphasized as a major goal of Chapter X. It has been pointed out that a claimant or stockholder may have many legitimate reasons for opposing a plan, any one of which will ordinarily fall short of 'bad faith.' For example, from the point of a view of a person who is interested in income, the proposed plan may be undesirable; from the point of view of the person who is interested in market value or capital appreciation, the plan may be satisfactory. One security holder may approve a plan because of certain proposed features, such as a change of management; another may disapprove the plan because he believes his proposed share in the distribution is not as large as it might be under another possible plan or if the proceedings were dismissed and liquidation ordered. Such motives, of course, are 'selfish' in that they are grounded on self-interest, but Rule 10–305(d) does not demand selflessness in voting. If it did, practically all votes could be disqualified. Hence the selfish end which Rule 10–305(d) condemns is one which, as the Supreme Court has said, looks to some added advantage to be gained over and above that normally accruing to the position of creditor or stockholder." 6 COLLIER ON BANKRUPTCY ¶ 9.21, at 1676–77 (Lawrence P. King et al., eds., 14th ed. 1978) (citations omitted); *See also John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 162 (3d Cir.1993) ("Trade creditors are often thought to vote their unsecured claims in order to further their interests as potential future suppliers of goods and services to the debtor.").

because it says "the Court should designate the vote submitted by Annoreno because the Annoreno claim was strategically incurred for the sole purpose of effectuating a cram-down."

There are two serious problems with the Lender's argument that the Debtor's alleged creation of the Annoreno claim, months before the bankruptcy filing, could constitute a basis to designate the Annoreno vote. The first problem is that § 1126(e) does not specifically refer to a bad faith creation of a claim as a basis to designate a vote. It only applies to bad faith in the solicitation or procurement of the *vote*, not to the creation of the claim on which the vote is cast. And most cases, following the seminal decision in *Century Glove*, hold that such "solicitation" is only a specific request for a creditor's official vote, not a mere hope or even understanding that the creditor will support a contemplated plan.[31] Because the creation of the Annoreno debt occurred months before the bankruptcy filing and even more months before the filing of a plan and the opportunity for Annoreno to cast an official vote, it is difficult to see how anything done by the Debtor prepetition could be deemed to have been part of the solicitation or procurement of Annoreno's vote. Perhaps this explains why the Lender never specifically argues that the Annoreno vote was "solicited or procured" in bad faith, because the mere alleged "strategic" creation of the debt does not necessarily imply an improper solicitation or procurement of the vote.

The second problem is that *Figter* and virtually all of the case law under § 1126(e) deal with *creditors'* motives, not the motives of debtors or other plan proponents. *Figter*, *Landing* and *DBSD* all specifically held that a disqualifying "ulterior" motive must be something ulterior to the voter's interest as a creditor. How does that test apply to a debtor-plan proponent, who neither votes nor has any creditor interests?

■ The only logical extrapolation of *Figter* to the debtor/plan proponent is to conclude that the disqualifying "ulterior" motive must be a motive that is ulterior to the party's role or capacity in the bankruptcy case. Indeed, authorities under the Act predecessor made exactly this analysis and adopted the same "ulterior motive" test to creditors and to equity, based on their proper role as and capacities in the case.[32] Therefore the clear implication of *Figter* is that it is not bad faith for a debtor to solicit a vote (including creating the debt) unless his motive is ulterior to that of a debtor/plan proponent. For example, applying the *Young v. Higbee* dictum relied upon by the *Figter* opinion, it would be bad faith for a debtor/plan proponent to solicit votes with a motive to "exact for [himself] undue advantages," or to obtain "some particular preferential advantage" to which it was not entitled.[33]

If the purpose for creating the debt was to create a class that would likely satisfy § 1129(a)(10) and therefore render the plan confirmable, such a motive is not at

---

**31.** *Century Glove v. First Am. Bank of New York*, 860 F.2d 94, 102–03 (3d Cir.1988).

**32.** For example, Colliers summarized the "test" under Act § 203 to require "some 'ulterior' reason for their action which looks to some special advantage or increment to be gained thereby," and then applied that same test to both creditors and stockholders "in the light of their own honest desires and their

own position." COLLIER ON BANKRUPTCY, *supra* note 30.

**33.** *Young v. Higbee Co.*, 324 U.S. 204, 211 n. 10, 65 S.Ct. 594, 89 L.Ed. 890 (1945), quoting Hearings on Revision of the Bankruptcy Act, H.R. 6439 Before the H. Comm. on the Judiciary, 75th Cong., 180–82 (1937).

all ulterior to that of a debtor who is the plan proponent. He naturally wants the plan he proposes to be confirmable and confirmed, and his actions in creating an accepting class are clearly consistent with that motive and his proper role and capacity in the bankruptcy case. Indeed, § 1129(a)(10) not only encourages but requires plan proponents to obtain the acceptance of such an impaired class, so the purpose to do so must be entirely consistent with the plan proponent's role and capacity in the case.

And the prepetition creation of a potentially accepting class does not exact for the debtor any particular preferential advantage that he is not entitled to, because even if the plan is therefore rendered confirmable it cannot yield anything more than the debtor is entitled to under all the other confirmation requirements. The plan must, for example, still satisfy the best interests of creditors test, the no unfair discrimination requirement, and the fair and equitable requirement. Note, however, that it might be a different case if the vote were being used to avoid any of those requirements, because it could then be argued to have been solicited to obtain something more for the debtor that he would not otherwise have been entitled to, but that is not the case when the only purpose is to satisfy § 1129(a)(10). And the creation of the debt is certainly not a preferential advantage to the debtor but rather a *cost* to the debtor, who still must pay the debt, together with interest at a rate that the creditor will accept, in this case 5%. It would turn the history and purpose of §§ 203/1126(e) on its head to disqualify a vote solicited by someone who is getting *less* out of the case, rather than more, because he had to create *and pay* a debt in order to confirm a plan.

Based on *Figter*'s controlling holding that equates bad faith with a motive that is ulterior to the party's proper role and capacity in the bankruptcy case, and applying this Court's "perspicacity derived from the data of its informed practical experience," I must find there is no analysis, allegation or argument, must less evidence, that the alleged creation of the Annoreno claim was in bad faith for purposes of §§ 1126(e) and 1129(a)(10), even if the Lender could prove at evidentiary hearing that the Annoreno claim was manufactured in contemplation of bankruptcy and for the purpose of satisfying § 1129(a)(10).

### Analysis of Good Faith Not Defined By Ulterior Motive

Perhaps the Lender will argue that there is something in the origin or history of § 1126(e) that necessitates a different standard for debtors than for creditors, so that it is not valid to extrapolate *Figter's* ulterior motive definition—ulterior to the party's proper role and capacity in the case—to debtors or plan proponents. Indeed, notwithstanding the requirement of Arizona Ethical Rule 3.3(a)(2) which requires disclosure of "legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client," the Lender's motion never even cites *Figter*, as if it has no bearing on the requirements for designation of a vote solicited by the debtor/plan proponent.

*Figter* said nothing explicit about how its ulterior motive analysis might apply to someone other than a creditor. Therefore to determine whether *Figter* might possibly allow for a different definition of good faith for debtors or plan proponents than for creditors, it necessary to analyze the analytical approach applied in *Figter* to determine whether that same approach, applied to a very different kind of party in a case, might yield a different result. There are at least three methods of analysis: a comparison of the factual back-

ground and results; a consideration of whether there is any other possible definition of good faith the Court could have adopted for a different party; and an analysis whether the history of the provision could yield a different conclusion when applied to a different party in the case.

On the first two approaches, it is rather easy to conclude that the Ninth Circuit had the perfect opportunity in *Figter* to define good faith for purposes of § 1126(e) in terms very different from a motive that is ulterior to the party's role and capacity in the case. It would have been much easier for the Ninth Circuit to adopt the same meaning for "good faith" for purposes of § 1126(e) as it had previously adopted for the same term as it is used just three sections later, in § 1129(a)(3). That would have meant that "good faith" would be found to exist when either the plan as a whole, or the challenged vote in particular, "achieves a result consistent with the objectives and purposes of the Code." [34] Although that precise quote is from the *Sylmar Plaza* decision of 2002, five years after *Figter*, that has been the Ninth Circuit's definition of good faith for purposes of § 1129(a)(3) at least since 1989,[35] some eight years before *Figter*.

The adoption of the general definition of good faith for purposes of Chapter 11, under the Bankruptcy Code as distinct from the Act, might have generated a different result for the secured creditor on the *Figter* facts, but not a different result here. Considering the secured creditor's purchase and voting of unsecured claims in light of the "objectives and purposes of the Code" would have entailed an analysis of the purposes and objectives of § 1129(a)(10) in particular, because that was the precise object of the purpose and voting of those claims. That analysis would have concluded, based on all the existing authorities, that the only purpose of § 1129(a)(10), which had no predecessor or counterpart under the prior Bankruptcy Act, was to require "some indicia of creditor support for the debtor's schemes." [36]

When the *Figter* facts are analyzed using the accepted § 1129(a)(3) meaning of "good faith," the result in *Figter* might well have been different for the secured creditor. The Ninth Circuit might well have concluded that the effort to purchase claims, in a class in which the purchasing creditor had absolutely no interest, for the sole purpose of outvoting the existing creditors in that class who supported the debtor's plan, was contrary to the purpose and objective of § 1129(a)(10)—to find some indicia of creditor support for the debtor's plan. It is difficult even to hypothesize an argument the creditor could make that its actions were not contrary to that purpose. That was, admittedly, its *sole* purpose, to deny the indicia of creditor support that Congress sought when it adopted § 1129(a)(10). Under the *Sylmar* and *Madison Hotel* definitions of good faith, that is manifestly not good faith.

But that definition of good faith would not necessitate a different result here. Even if the Debtor created the Annoreno debt in contemplation of bankruptcy and of needing an accepting impaired class, nothing in that conduct is even arguably incon-

---

**34.** *Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.),* 314 F.3d 1070, 1074 (9th Cir.2002).

**35.** *Ryan v. Loui (In re Corey),* 892 F.2d 829, 835 (9th Cir.1989). *Accord, In re Madison Hotel Assocs.,* 749 F.2d 410, 425 (7th Cir. 1984).

**36.** P. Murphy, Creditor's Rights in Bankruptcy, Section 16.11, at 16–20 (1980), quoted in *In re Polytherm Indus., Inc.,* 33 B.R. 823, 835 (W.D.Wis.1983); *In re Barrington Oaks Gen. P'ship,* 15 B.R. 952, 969 (Bankr.D.Utah 1981).

sistent with the "objectives and purposes" of either the Code as a whole or § 1129(a)(10) in particular. In short, even the creation of a debt for the purpose of generating an accepting impaired class is not inconsistent with Congress' purpose to ascertain "some indicia of creditor support." And it is most certainly less inconsistent with that purpose than allowing a secured creditor to silence the support that exists among the unsecured creditors.

So this potential alternative definition of good faith does not support a conclusion that the Debtor's method of obtaining an acceptance from the Annoreno creditor class lacked good faith, even if there were a basis to apply a different good faith standard to debtor than applies to creditors.

More significantly, the *Figter* opinion clearly indicates that the § 1129(a)(3) meaning of good faith is *not* to be applied under §§ 1126(e) and 1129(a)(10). This is most evident because there is absolutely no consideration of the purpose of § 1129(a)(10) anywhere in the *Figter* opinion, even though that was manifestly the secured creditor's strategy. Indeed, there is only one citation or reference to § 1129(a)(10) in the entirety of the *Figter* opinion, and that is found only in the factual and procedural background, not in the analysis. Nor was there any consideration of the rights and interests of the other unsecured creditors who supported the debtor's plan, thirteen of whom apparently refused to sell their claims for one hundred cents on the dollar, but whose support was outvoted by a secured creditor who successfully bought 21 of the votes.[37] It is therefore indisputable that the Ninth Circuit deems good faith for purposes of §§ 1126(e) and 1129(a)(10) to have nothing

to do with the general definition of good faith, or with the purposes and objectives of the Bankruptcy Code.

## More Complete Historical Analysis Does Not Yield Any Different Result

As noted above, although the Ninth Circuit clearly derived its "ulterior motive" definition of bad faith from the history and origins in § 1126(e), the analysis of that history in the *Figter* opinion was extremely truncated. It relied solely on some Supreme Court dictum in a case decided in a very different context (whether an appeal should be dismissed when the stockholder who brought it sold his stock and appeal rights to the adverse party, without sharing the payment with other stockholders who would have benefitted from the appeal). The *Figter* opinion never mentioned who drafted the predecessor of § 1126(e), what facts generated the felt need for the provision, nor how that predecessor functioned under the prior Bankruptcy Act (indeed, the opinion does not even recognize that the predecessor was not in the Bankruptcy Code, but under the prior Bankruptcy Act). Therefore it is possible that a more thorough analysis of that origin, purpose and legislative history of § 1126(e) might have generated a different result when applied to a debtor/plan proponent. In fact, however, a more complete historical analysis suggests that while the result in *Figter* itself might have been different, the result here would be unchanged.

The first general corporate reorganization statute that was adopted in 1933, § 77B, for the first time allowed corporations access to statutory reorganization, and in so doing rapidly expanded the jurisdiction of bankruptcy courts.[38] Section

---

**37.** *Figter*, 118 F.3d at 637.

**38.** John W. Hopkirk, *William O. Douglas— His Work in Policing Bankruptcy Proceedings,*

77B(f)(6) required the bankruptcy court to confirm a plan only if the offer of the plan and its acceptance are in good faith,[39] but did not expressly authorize a judge to designate and disqualify votes. Some courts therefore refused to nullify acceptances or rejections by claimants who were intending to prevent a debtor's reorganization for selfish ends.

In *Texas Hotel Securities v. Waco Development*, the district court held that a competitor and former lessee of the debtor could not vote, against the debtor's plan of reorganization, the notes that it had acquired with the sole intent of preventing the debtor's reorganization so that it could obtain control of the debtor's hotel.[40] But the Fifth Circuit reversed, holding that § 77B did not authorize the reorganization court to disregard these dissenting votes because they were being used "to force recognition of a supposed right."[41] In the wake of *Waco* and similar holdings, "capricious minorities" were able to exercise a large veto power that they could use to prevent a competitor from reorganizing, or "to extort tribute from other creditors and stockholders as the price of their assent to a plan."[42]

Under both § 77B and the subsequent Chapter X added to the Bankruptcy Act by the 1938 Chandler Act amendments, the newly created Securities and Exchange Commission played a major role. It was required to pass on plans of reorganization prior to their consideration by the bankruptcy court. And it played a major role in the drafting of the Chandler Act, primarily to identify and recommend solutions to abuses that it found to have occurred under equity receiverships and § 77B.

When the Chandler Act was drafted to supersede section 77B and add Chapters X, XI, XII and XIII to the Bankruptcy Act in 1938, the Securities and Exchange Commission drafted and urged the adoption of what became Act § 203.[43] Although the SEC's Protective Committee Report was not published until two years after the adoption of the Chandler Act, SEC Com-

18 Vand. L. Rev. 663, 677 (1965) (citing 48 Stat. 912 (1934)).

**39.** *Cont'l Ins. Co. v. Louisiana Oil Ref. Corp.*, 89 F.2d 333, 337 (5th Cir.1937) ("The judge in acting on a plan must investigate the good faith and purity of the acceptance, and the time of acquiring the claims so voting.").

**40.** *Texas Hotel Sec. Corp. v. Waco Dev. Co.*, 87 F.2d 395, 397–98 (5th Cir.1936).

**41.** *Id.* at 399. Here, the dissenters were previous lessees of the debtor's property, and the default caused them the loss of a large investment. These creditors felt they "had a moral right in the hotel properties or perhaps an equity arising out of oppression." As such, "[n]o legal wrong is done the debtor if it cannot secure the required consents and is held to its original engagements, for that is but leaving to the creditors their original rights.... There is only a question of its acceptability to the creditor, and not of the justice or validity of his reasons." *Id.*

**42.** SEC Report on the Study and Investigation of the Work, Activities, Personnel and Functions of Protective and Reorganization Committees, Part VIII, at 121 (Sept. 30, 1940) [hereinafter SEC Protective Comm. Rep.] ("[T]here is now little doubt that Section 77B was deficient in not specifically giving to courts the power to disregard the votes of those holding a veto control who dissented from a plan in order to serve some ulterior selfish purpose.").

**43.** § 203 provides: "If the acceptance or failure to accept a [Chapter X] plan by the holder of any claim or stock is not in good faith, in the light of or irrespective of the time of acquisition thereof, the judge may, after hearing upon notice, direct that such claim or stock be disqualified for the purpose of determining the requisite majority for the acceptance of a plan." § 203 of the Bankruptcy Act.

missioner Douglas (the primary drafter of that Report) testified to Congress in support of § 203 a year prior to its adoption.[44] It is fair to conclude that Commissioner Douglas was the primary drafter of *both* the Protective Committee Report and § 203.[45] The SEC, under the direction of then Commissioner William O. Douglas, intended § 203 to provide express permission for judges to disqualify a vote not made in good faith, and to prevent stockholders or creditors "by the use of obstructive tactics and hold-up techniques [to] exact for themselves undue advantages."[46] The SEC's Protective Committee Report was among the first authorities to identify "ulterior reasons" as the proper target for designation pursuant to § 203.[47]

Perhaps the earliest equation of bad faith with ulterior motives was the First Circuit's 1936 decision in *Downtown Investment Association* that was quoted at some length in the SEC Protective Committee Report.[48] Although there was neither any precursor to § 1126(e) or § 1129(a)(10) in effect, the plan had to be accepted by two-thirds of each class of creditors affected by the plan, and the court had to determine both that the acceptances were in good faith and that the plan was fair and equitable. In *Downtown Investment*, the First Circuit noted that the two-thirds acceptance would provide strong evidence that the plan is fair and equitable, but that such evidence would be "much impaired" if some of the acceptances "may have been due to ulterior reasons not common to all of the class of the creditors or other parties whose assent is called for."[49]

But where acceptances were solicited before the court determined the plan to be fair and equitable, the SEC Protective Committee Report concluded that "Section 77B was deficient in not specifically giving to courts the power to disregard the votes of those holding a veto control who dissented from a plan in order to serve some ulterior selfish purpose."[50] The SEC Report then cited *Texas Hotel Securities v. Waco Development* as "also in point."[51]

---

44. COLLIER ON BANKRUPTCY, *supra* note 30, at 1674–76 & nn. 14, 15, 16, 18 & 22.

45. "Representative Chandler requested the Douglas group [the SEC study group] to meet with representatives of the National Bankruptcy Congress and iron out such differences as they might have concerning the proposed legislation. In the course of this work on the revision of 77B, chapter X of the Chandler Act, became a vehicle for enactment of many of Douglas' views on corporate reorganization. The congressional hearings reveal through Douglas' own testimony the features of the new chapter X which he regarded as of central importance. In only a few instances does it appear that Douglas failed to place in the law provisions in conformity with the position of his Commission." *Hopkirk, supra* note 38, at 678. In Chapter X cases, "The judge was granted broad authority to disallow undesirable provisions in proxy and deposit agreements, to restrain exercise of those 'unfair or not consistent with public policy....'"

*Id.* at 679. Douglas' "imprint is extensive throughout the eight volumes of the SEC final report. In fact, he wrote a considerable portion of the report's 4,048 pages himself." *Id.* at 667.

46. Hearings on *The Revision of the Bankruptcy Act*, H.R. 6439 Before the H. Comm. on the Judiciary, 75th Cong., 180–82 (1937).

47. SEC Protective Comm. Rep., *supra* note 42, at 121.

48. *Downtown Inv. Ass'n v. Boston Metro. Bldgs., Inc.*, 81 F.2d 314 (1st Cir.1936), quoted in SEC Protective Comm. Rep., *supra* note 42, at 121.

49. *Downtown Inv. Ass'n*, at 324, quoted in SEC Protective Comm. Rep. at 121.

50. SEC Protective Comm. Rep. at 121.

51. *Id.* at 123.

In *Young v. Higbee,* the Supreme Court subsequently confirmed that the purpose of § 203 was that identified in the SEC Protective Committee Report, effectively to provide courts the authority to reverse the result in *Waco.*[52] But while it is certainly correct to identify *Waco* as the context of the SEC's proposal and draft of § 203 of the Chandler Act, and it is also therefore historically correct to equate bad faith with "ulterior motive," it is not historically correct to conclude that "ulterior" meant ulterior to the creditor's capacity as a creditor.

Rather, the SEC's concern, and therefore the drafter's understanding of a lack of good faith, was with "ulterior reasons *not common to all of the class* of the creditors" whose vote was being dominated.[53] To the drafter's understanding "ulterior" meant ulterior to the interests of the other members of the class, not just ulterior the interest of a creditor *qua* creditor. The Supreme Court made this very explicit in its *holding* in *Avon Park,*[54] in an opinion authored by Justice Douglas just two years after the adoption of the Chandler Act and just one year after he left the SEC and assumed the bench. There the Supreme Court reversed the confirmation of a Chapter IX plan because it found good faith lacking when the City's fiscal agent had undisclosed conflicts of interest when it acquired and voted the claims of some bondholders. That conflict of interest was what necessitated the finding of a lack of good faith, as a matter of law (since the district court found good faith and confirmed the plan): "Where it does not affir-

matively appear that full and complete disclosure of the fiscal agent's interests was made to the bondholders when their assents were solicited, it cannot be said that those assents were fairly obtained. And where without such disclosure the fiscal agent's vote was cast for acceptance of the plan, it cannot be said that such acceptance was in 'good faith'.... Here the fiscal agent was acting in a dual capacity."[55] The opinion emphasized the duty of the court to investigate the circumstances of the acquisition of the acceptances and "the special or *ulterior motives* which may have induced them."[56] And, "Where such investigation discloses the existence of unfair dealing, a breach of fiduciary obligations, profiting from a trust, special benefits for the reorganizers, or the need for protection of investors against an inside few or of *one class of investors from the encroachments of another,* the court has ample power to adjust the remedy to meet the need."[57]

Thus when the good faith requirement for voting was originally drafted, it was intended and understood that "ulterior motive" referred to a motive ulterior to the interests of the other members of the class whose vote was being dominated. That was what "ulterior motive" meant in the first Circuit Court opinion to use the term in 1936, that is what it was understood to mean when the SEC drafted § 203 and when Commissioner Douglas testified before Congress in 1937, and what it meant in the first subsequent Supreme Court decision to use the term in a highly relevant

---

52. *Young v. Higbee,* 324 U.S. 204, 211, 65 S.Ct. 594, 89 L.Ed. 890 (1945).

53. SEC Protective Comm. Rep. at 121, quoting *Downtown Inv. Ass'n, supra* (emphasis added).

54. *Am. United Mut. Life Ins. Co. v. City of Avon Park,* 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91 (1940).

55. *Id.* at 144, 61 S.Ct. 157 (citations omitted).

56. *Id.* at 145, 61 S.Ct. 157 (emphasis added).

57. *Id.* at 146, 61 S.Ct. 157 (emphasis added).

context in 1940. Undoubtedly, that is what it meant when Congress enacted the predecessor to § 1126(e) in 1938. It did not matter that the motive was not ulterior to that of a creditor simply *qua* creditor, if the motive was only appropriate for a creditor in another class than the class whose vote was being dominated.

That was the same meaning understood for "good faith" when the Code and § 1126(e) was adopted in 1978. That was the meaning understood by the leading authority at the time, Collier on Bankruptcy: "The test, then, seems to be whether or not those sought to be disqualified have some 'ulterior' reason for their action which looks to some special advantage or increment to be gained thereby."[58] And that understanding was explicitly understood by Congress when it enacted § 1126(e) of the Bankruptcy Code. As originally drafted, § 1126(e) specifically provided that the court could designate the votes of any claims whose holder had a conflict of interest.[59] That explicit reference to a conflict of interest was eventually deleted because it was regarded as redundant.[60] As passed, § 1126(e) expanded on previous versions with the inclusion of a vote solicitation standard, but it still retained its core function of its predecessors by allowing courts to designate votes cast in support of a motive ulterior to the interests of the other members of the class.

If "ulterior motive" is understood in the context of the history of its use as a defini-

tion of good faith for purposes of §§ 203 and 1126(e), the disqualifying "ulterior motive" exists whenever a party is motivated by interests that are not common to the class of votes that it seeks to dominate, even if that motive may be entirely appropriate in light of the party's other interests, even interests that are appropriate to its role and capacity in the case. On that analysis, the result in *Figter* clearly would have been different. A secured creditor who purchases unsecured claims, when that secured creditor has no unsecured claim of its own because it is oversecured, clearly has an ulterior motive. Its motive, as recognized by the *Figter* opinion, was to dominate the unsecured creditor class vote solely in order to protect its interests as a secured creditor-an interest not shared or common to the other members of the unsecured creditor class. Justice Douglas would have had no problem identifying that as an ulterior motive that equates with bad faith.

But would that mean the Debtor's motives here, in allegedly creating the Annoreno secured debt, must be deemed ulterior? The Debtor's motives in doing so—to obtain a class whose acceptance can render the plan confirmable under § 1129(a)(10)— do not seem to be at all inconsistent with either the Debtor/plan proponent's role or capacity in the case, nor with the interests of the class with which he is most naturally aligned—the class of equity holders. Both the Debtor, the plan proponent, and the

---

**58.** COLLIER ON BANKRUPTCY, *supra* note 30, at 1676.

**59.** "A person might have such a conflict, for example, where he held a claim or interest in more than one class. Exclusion from one class for voting purposes would not require his exclusion from the other class as well. The result is to overrule cases such as *Aladdin Hotel Co. v. Bloom*, 200 F.2d 627 (8th Cir. 1953), which, though not in the bankruptcy context, would appear to count votes for a

reorganization plan motivated by an attempt to squeeze out a minority of a class. In that case, the conflict of interest of those voting for the plan was clear, but the court permitted the votes." H.R.Rep. No. 95–595, at 411 (1977), 1978 U.S.C.C.A.N. 5963, 6367.

**60.** 124 Cong. Rec. H11103 (daily ed. Sept. 28, 1978) & S17420 (daily ed. Oct. 6, 1978) (remarks of Rep. Edwards and Sen. DeConcini).

equity holders seek to have the plan confirmed. Nothing in what the Debtor has allegedly done to manufacture an accepting impaired class, and obtain the acceptance of Annoreno, is at all inconsistent with those interests.

And by allegedly creating the Annoreno class, the Debtor/plan proponent has done *nothing* to dominate the votes or interests of any other class of creditors—the original concern of the drafters of the predecessor of § 1126(e). The Annoreno vote has not affected the vote of either the other classes of secured creditors, or the class of unsecured creditors. And if any such domination could have occurred, it is fully remedied by segregating the Annoreno vote in its own class. As the *Avon Park* opinion noted, where there is a need for the protection "of one class of investors from the encroachments of another," an appropriate remedy would be "the separate classification of claimants." [61]

This expanded historical analysis supports the conclusion that while the secured creditor's vote in *Figter* may have been in bad faith, because it was used to dominate the votes of another class whose interests conflicted with those of the secured creditor, the Debtor's alleged strategic manufacture of the Annoreno debt, class and vote would not be in bad faith, because that vote did not dominate the votes of any other creditors. Indeed, this conclusion and analysis reveals an even more fundamental reason why the Ninth Circuit did not adopt the historical and drafter's understanding of "ulterior motive," and why the good faith standard for acceptance under the Bankruptcy Act does not require the same standard for acceptance for purposes of § 1129(a)(10) under the Code. It is because the acceptances whose good faith is now being questioned for purposes of § 1129(a)(10) under the Code serve a very different purpose from the acceptances whose good faith was questioned under the Chandler Act.

Under the 77B and Chapter X cases, the voting that was being manipulated by the voting of purchased claims was the vote as to whether the plan was fair and equitable and could be approved. In other words, the purchased votes were being cast for purposes of influencing the court's determination as to whether the plan's *treatment* of that class of creditors was fair and equitable. All of the Act cases indicate that what is bad faith is to manipulate such votes in an effort to extort special *treatment.* That is not the case with votes such as those under consideration here, or under all of the relevant Code cases, which are limited to satisfaction of § 1129(a)(10), and have no bearing on the treatment of creditors under the plan.

Section 1129(a)(10) did not exist under the Act, had no predecessor under the Act, and was not the reason why anyone sought to manipulate the votes under any of the Act cases that construed and applied Act § 203. The Chandler Act amendments to the Bankruptcy Act did not expressly require that there be any accepting impaired class, so long as the treatment of all classes satisfied the best interests of creditors and the fair and equitable requirements for their treatment. Yet without any statutory authority, some courts, led by the Seventh Circuit's 1941 decision in *Herweg,* had held that acceptance by some

---

**61.** *Avon Park,* 311 U.S. at 146, 61 S.Ct. 157, citing *First Nat'l Bank v. Poland Union,* 109 F.2d 54, 55 (2d Cir.1940) ("[T]wo of the largest accepting creditors happen to be shareholders as well, and they stand to profit considerably by a release of their disputed liability. In such circumstances, it may be doubtful whether they should be permitted to vote in the same class with other creditors not so intimately connected with the enterprise.").

creditors was inherent in the concept of a composition or arrangement, and therefore imposed that requirement.[62]

In 1973, when the Commission On the Bankruptcy Laws of the United States submitted its Report recommending revision of the bankruptcy law and consolidating Chapters X, XI and XII, it did not contain any provision expressly requiring an accepting class. Instead, the Commission's draft retained a structure similar to what had existed under the Act, permitting cram down treatment of dissenting classes and determining acceptance "exclusive of those creditors and equity security holders who are [so] provided for." [63]

In 1977, however, while Congress was considering both the Bankruptcy Commission's draft bankruptcy code and the Judges' bill,[64] two bankruptcy court decisions extensively analyzed the "judicial gloss" of *Herweg* and its progeny and concluded that it was unwarranted by the statutory language, legislative intent, or purposes of Chapter XII.[65] Both cases

**62.** *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 585–86, 55 S.Ct. 854, 79 L.Ed. 1593 (1935) ("In no case of composition is a secured claim affected except when the holder is a member of a class; and then only when the composition is desired by the requisite majority and is approved by the court. Never, so far as appears, has any composition affected a secured claim held by a single creditor.") (dictum in holding the involuntary treatment of secured debt under the Frazier–Lemke Act constituted an unconstitutional taking of property); *Herweg v. Neuses (In re Herweg),* 119 F.2d 941, 943 (7th Cir.1941) ("We do not understand that this section [the cram down provision of Bankruptcy Act, § 461(11)] provides a substitute for an arrangement, nor that it contemplates dispensing with an arrangement when no creditors can be found to consent to it.") (Chapter XII); *Hamburger v. Dyer (In re Hamburger),* 117 F.2d 932, 935 (6th Cir.1941) ("Although an arrangement . . . 'may include: the retention by the debtor of all or any part of his property' [§ 461(12)] this provision is not mandatory and cannot be availed of for the debtors' relief unless it is included in an arrangement approved by the requisite number of creditors affected (§ 466).") (Chapter XII); *Kyser v. MacAdam,* 117 F.2d 232, 238 (2d Cir.1941) (It is improper to deprive secured creditors of the right to vote by applying § 461(11) adequate protection.) (Chapter XII); *Meyer v. Rowen (In re Meyer),* 195 F.2d 263, 266 (10th Cir.1952) ("But, it was obviously not the purpose of Section 461, sub. 11 to dispense with an arrangement when no creditors can be found to consent to it; nor does it authorize the bankruptcy court to force secured creditors, unanimously opposed to the plan, to accept it simply because adequate protection is provided.") (Chapter XII); *Taylor v. Wood,* 458 F.2d 15 (9th Cir. 1972) (the court affirmed, without comment or analysis, the referee's conclusion that "debtor's plan was incapable of confirmation under Section 467 or 468 of the Bankruptcy Act where the lone creditor affected refused to accept"); *see e.g.* *In re Northland Const. Co.,* 2 B.C.D. 1598, 1602 (E.D.Wis.1976) (the *Herweg* analysis, although concerned with chapter XII, applies with equal force to chapter X).

**63.** Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 137, pt. ii, §§ 7–303(7) & (8) and 7–310(d)(1) (1973), *reprinted in* VOL. B COLLIER ON BANKRUPTCY App. Pt. 4(c) at 816 & 826 (Alan N. Resnik & Harry J. Sommer eds., 16th ed. 2012).

**64.** See the extensively thorough history of the evolution of § 1129(a)(10) in *In re Greystone III Joint Venture,* 102 B.R. 560, 562–66 (Bankr.W.D.Tex.1989), *rev'd on other grounds,* 995 F.2d 1274 (5th Cir.1991).

**65.** *In re Hobson Pike Assocs., Ltd.,* 1977 WL 182364, at *7, 3 BCD 1205 (Bankr.N.D.Ga. Sept. 20, 1977) ("There is no specific or clear statutory authority in Chapter XII that the one and only creditor, which is provided 'adequate protection' under § 461(11) can defeat by mere opposition the plan and prevent confirmation just because the debtor has no other creditor to affirmatively accept the plan."); *In re Mass. Mut. Life Ins. Co. v. Marietta Cobb Apartments Co. (In re Marietta Cobb Apartments Co.),* 1977 WL 182365, 3 BCD 720 (Bankr.S.D.N.Y. Sept. 9, 1977) (The *Herweg* "reading of the Act would foreclose Chapter

therefore concluded that a plan could be confirmed that satisfied the best interests, fair and equitable, and absolute priority rules for treatment, even if there was no class that accepted it.

Apparently in reaction to these two decisions Congress considered an amendment to the proposed Bankruptcy Code to require at least one accepting class.[66] All authorities agree that the intent and purpose of § 1129(a)(10) was merely to require "some indicia of creditor support for the debtor's schemes."[67]

Section 1129(a)(10) is therefore a purely "technical requirement for confirmation," but "is not a substantive right of objecting creditors."[68] Although that bankruptcy court's conclusion has not been explicitly adopted by the Ninth Circuit, it has certainly been implicitly adopted. *Anaheim*[69] is probably the most dramatic case in point. Although § 1129(a)(10) requires acceptance by an *impaired* class, the Ninth Circuit there held that the accepting class could be deemed impaired because its rights were *enhanced* compared to what

they would have been under state law. Although the sole purpose of its decision was to determine whether there was the requisite acceptance for purposes of § 1129(a)(10), the *Anaheim* opinion contained absolutely no analysis of the purposes of that requirement, any parties' interests it was meant to protect, or any substantive rights it conferred on anyone. And of course the court's ultimate conclusion, that "impairment" for purposes of that provision can mean "improvement," necessarily implies that the Ninth Circuit regards the issue as highly technical, if not academic or even Talmudic. And *Figter* itself leads to the same conclusion. In concluding that there is no bad faith in a secured creditor purchasing claims in order to dominate the vote of unsecured creditors, with whom it shared no interest, the Ninth Circuit never even mentioned, much less considered, the purpose of § 1129(a)(10), any rights or interests it might have been intended to protect, or even the interests of the other unsecured creditors in the dominated class who declined to sell their votes.

XII as a vehicle for the rehabilitation of a debtor with one mortgagee—the norm in a large percentage of today's cases.").

**66.** *See Greystone III Joint Venture, supra* 102 B.R. at 565–66; *In re Polytherm Indus., Inc.,* 33 B.R. 823, 834 (W.D.Wis.1983); *In re Barrington Oaks Gen. P'ship,* 15 B.R. 952, 969–70 (Bankr.D.Utah 1981).

**67.** P. Murphy, CREDITOR'S RIGHTS IN BANKRUPTCY, Section 16.11, at 16–20 (1980), *quoted in Polytherm, supra,* 33 B.R. at 835 and *Barrington Oaks, supra,* 15 B.R. at 969. "This court cannot find any particular congressional intent, either expressed or implied in Congress' sausage-making exercise, that compels the court to read together the various Code provisions in such a way as to confer on secured creditors in cases such as these the veto power for which [the secured creditor] now lobbies." *Greystone, supra,* 102 B.R. at 566.

**68.** *In re 7th Street and Beardsley P'ship,* 181 B.R. 426, 431 (Bankr.D.Ariz.1994) (Case,

B.J.). *Accord, Greystone III Joint Venture, supra,* 102 B.R. at 566 ("If any purpose can be divined from the Code's structure, it is that, in real estate cases such as this, the ultimate confrontation will take place over whether the plan can satisfy the stringent requirements of cram-down imposed by Section 1129(b), not whether it can satisfy the hyper-technical (and largely impractical) requirements of Section 1129(a)(10). This court cannot find any particular congressional intent, either expressed or implied in Congress' sausage-making exercise, that compels this court to read together the various Code provisions in such as way as to confer on secured creditors in cases such as these the veto power for which [the secured creditor] now lobbies.").

**69.** *L & J Anaheim Assocs. v. Kawasaki Leasing Int'l, Inc. (In re L & J Anaheim Assocs.),* 995 F.2d 940 (9th Cir.1993).

The most logical conclusion of why the Ninth Circuit in *Figter* failed to apply the same meaning of good faith as applies under § 1129(a)(3)—consistency with the purposes of the Code—and why it failed to apply the original, historical and draftsmen's intent and understanding of bad faith as consisting of motives ulterior to those of the class being dominated, is because it regards § 1129(a)(10) as a purely technical requirement that neither protects nor confers any substantive rights. Thus for purposes of § 1129(a)(10), the court will not inquire into the motives for the alleged manipulation of the votes so long as they are consistent with the party's proper role and capacity in the case. Both parties are free to manipulate this provision, so long as it is not done out of malice, a competitor's interest to destroy the debtor, or an attempt to extort preferential treatment. Therefore that permissive manipulation to satisfy this purely technical requirement must include the strategic pre-petition creation of a debt in anticipation of it ultimately providing the accepting impaired class vote, so long as there is no fraud, no injury to anyone's rights or interests, and no attempt to extort more than either that accepting creditor or the debtor/plan proponent would be entitled to under the other confirmation requirements. It is no more improper for a debtor to manufacture a class to provide that acceptance than it is for a creditor to manufacture its denial by purchasing and voting claims of creditors whose interests it does not share. Put another way, just as the outvoted creditors' interests were of so little concern to the Ninth Circuit in *Figter* that they did not merit any mention, so the Lender here has no cause to complain about how another class of creditors provided the satisfaction of § 1129(a)(10).

Therefore, in applying its perspicacity derived from the data of its informed practical experience in dealing with debtors and their creditors, this Court finds as a fact that there was no bad faith in this Debtor's solicitation or procurement of Annoreno's acceptance, even if the Annoreno claim had been created (without fraud or harm to anyone's legitimate interests) with intent to use it to satisfy § 1129(a)(10). The Lender's motion to designate the Annoreno acceptance is therefore denied because the Lender could not satisfy its burden of proof even if it could prove all of its suspicions.